**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gaetano Phillip PUGLISI,
Defendant-Appellant.**

No. 82–8592.

United States Court of Appeals,
Eleventh Circuit.

Jan. 23, 1984.

David M. Lawson, Southfield, Mich., for defendant-appellant.

Julie Carnes, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before TJOFLAT, VANCE and CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

Gaetano Puglisi was indicted by a federal grand jury for possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1976). He was tried by the court and found guilty. We reverse Puglisi's conviction because the cocaine which was introduced in evidence at trial and provided the basis for his conviction was seized from him in violation of the fourth amendment.

I.

The critical events in this narcotics case began at 9:05 a.m. on April 19, 1982, when Gaetano Puglisi arrived in Atlanta's Hartsfield International Airport on Delta Flight 1122 from Fort Lauderdale, Florida. He deplaned at gate A25 and walked amidst the other disembarking passengers down the rampway to the waiting area by the gate. Puglisi did not have any carry-on baggage. Two uniformed Delta employees were standing in the waiting area directing

the arriving passengers to their connecting flights. Puglisi's connecting flight to his hometown, Las Vegas, was scheduled to leave gate A19 in approximately twenty-five minutes. Standing immediately behind the two Delta employees was the renowned Special Agent Paul Markonni of the Drug Enforcement Administration (DEA). Markonni, in plainclothes, was observing the deplaning passengers from this flight because the Fort Lauderdale, Miami, and Palm Beach areas were the most significant entrance sources of marijuana, cocaine, and methaqualone in the United States.

According to Markonni, as Puglisi entered the waiting area he looked forward and fixed his eyes on Markonni for two to three seconds. Markonni returned this stare for one to two seconds. His curiosity piqued, Markonni observed Puglisi walk through the waiting area, turn, and look back in Markonni's direction for a few seconds. Markonni followed Puglisi to gate A19. After Puglisi checked in for his Las Vegas flight, Markonni went to the check-in desk and obtained the ticket Puglisi had surrendered to the Delta clerk. Markonni took the ticket to an adjoining desk and recalled Puglisi's reservation record from the Delta computer. The record indicated that Puglisi's itinerary consisted of a one-way flight from Fort Lauderdale to Las Vegas, via Atlanta. Both legs of the flight, apparently, were nonstop. The ticket had been reserved at 1:03 that morning and the person making the reservation left no call-back number. The ticket had been purchased with cash.

Markonni then approached Puglisi, who was standing near a Delta information counter. Markonni showed Puglisi his badge, identified himself as a DEA agent, and asked permission to speak with Puglisi. Puglisi gave his permission, and at that point Markonni asked in a normal conversational tone if he could see Puglisi's ticket. Puglisi complied, and Markonni noticed that one baggage claim check was stapled inside the ticket cover and that the ticket had been issued in the name of "John Shapiro." Markonni asked Puglisi his name and he replied, "Gaetano Puglisi." Markonni then handed the ticket back and requested some identification. Puglisi handed over his Nevada driver's license which was in his true name. In response to Markonni's inquiry about the discrepancy in the names on the ticket and on the license, Puglisi answered that a friend had purchased the ticket for him. Then, according to Markonni,

> I [Markonni] said, "Why didn't your friend purchase the ticket in your name?" And he hesitated for a moment and said, "Well he was at the airport." And I said, "Well, I really don't understand. Apparently I don't understand why ... he could have purchased the ticket in your name even if he was at the airport." At that point, Mr. Puglisi didn't even answer that question.... He just didn't say anything at all.

Next, Markonni asked Puglisi how long he had been in Ft. Lauderdale. Puglisi replied that he had been there three days visiting friends. At this point, Markonni noticed that Puglisi had become very nervous and was having difficulty breathing. Markonni returned Puglisi's license and asked him if he would consent to a search of his person and the bag he had checked with Delta. Markonni advised him that he could refuse permission. Puglisi replied that he would consent to a frisk search and agreed to Markonni's suggestion that they retire to a more private place. Upon reaching a flight ramp, Puglisi spontaneously assumed the classic police search stance—hands on the wall, with legs and arms spread—to Markonni's surprise. Markonni patted him down but found no drugs. Markonni once more asked Puglisi if he would consent to a search of his bag. Puglisi responded without hesitation, "No, I don't want you to search my suitcase. I've got personal things in there, personal stuff in there." Markonni asked for the ticket again and jotted down the claim check number. Markonni returned the ticket and said, "Okay, that's it as far as I am concerned." At that point, Puglisi walked away. The entire encounter had taken approximately four minutes.

Markonni went directly to the Delta baggage loading ramp, one floor below the passenger waiting area, and, with the help of a Delta employee, located Puglisi's bag. It was a leather folding suit bag and was sitting on a cart adjacent to the airplane that was leaving for Las Vegas. The bag had a claim check that matched Puglisi's. Markonni directed the Delta employee to remove the bag from the cart. The time was approximately 9:17 a.m., twelve minutes after Markonni's first encounter with Puglisi. Markonni and the Delta employee took the bag upstairs to gate A19 where they were met by another DEA agent. Markonni spotted Puglisi walking toward gate A19 from a bank of telephones on the passenger concourse. When Puglisi arrived at the gate, Markonni stated, "Mr. Puglisi, we have located your piece of luggage." Puglisi replied quickly, "I have talked to somebody. I have talked to a friend on the telephone and she told me not to let you search anything and I want to get on my plane [scheduled to leave in ten to twelve minutes]." Markonni told Puglisi, "Well you're free to do that. You're free to go, but I'm afraid I will have to retain your suitcase until I can get a drug dog out here to check it." At trial, Markonni explained that the purpose of this statement was "[t]o tell him we located his bag, there was time left if he would consent to a search, and that we could do it and he would not miss his flight." Puglisi cut Markonni short, however, and said "Do what you got to do," and walked on the aircraft. This second confrontation lasted about three minutes, concluding around 9:25 a.m. Markonni then directed the second DEA agent to watch the aircraft until it backed out of the gate, dismissed the Delta employee, and took the bag to his office.

Markonni phoned the Douglas County, Georgia, Sheriff's Department from his office and requested that they bring "Sergeant Bandit," a narcotics detector dog, to the airport. The dog handler was at the Georgia Police Academy some miles away and had to drive back to Douglas County to pick up the dog before bringing him to the airport.[1] The handler and Sergeant Bandit arrived at the airport at approximately 11:27 a.m., and ten minutes later the dog alerted[2] to Puglisi's bag. Nearly 140 minutes had elapsed since Markonni had seized the bag. Markonni immediately took the bag to the federal courthouse in Atlanta, obtained a search warrant, and searched the bag. He found two parcels of white powder in the pocket of a pair of jogging shorts. A field test revealed this powder to be cocaine, and Markonni called Las Vegas to request DEA agents there to arrest Puglisi upon his arrival. They informed him that Puglisi's flight from Atlanta had been cancelled prior to takeoff due to mechanical problems that arose after it left the gate. Markonni promptly obtained a warrant for Puglisi's arrest, and found him at the airport waiting for a flight to Dallas/Ft. Worth and, ultimately, a flight to Las Vegas.[3] Markonni placed Puglisi under arrest, at 2:00 p.m.

Puglisi was indicted for possession of cocaine with intent to distribute. Following his arraignment, he moved to suppress the cocaine Markonni had seized from his suit bag. His motion was denied. Puglisi submitted to a bench trial, and the court found him guilty. He appeals, raising one issue, the validity under the fourth amendment of Agent Markonni's seizure of his suit bag and subsequent search.

Puglisi claims (1) that Markonni's original questioning of him constituted a "stop" or "seizure" without any articulable objective facts that criminal activity was afoot, the sort of conduct condemned in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889

1. During April 1982, Agent Markonni had the use, almost fulltime, of two drug detector dogs at Hartsfield Airport. On this particular day, however, neither dog was at the airport.

2. Markonni had set Puglisi's bag up in a row with other passengers' suitcases. Sergeant Bandit alerted to Puglisi's luggage by biting and

scratching it, thus indicating that some controlled substance was likely to be inside.

3. Although the record is not clear, it seems that this route was the best way for Puglisi to get to Las Vegas.

(1968); (2) that the initial removal of his luggage from the Delta baggage cart constituted a stop or seizure under *Terry* and was not based on reasonable suspicion or articulable facts of criminal activity; and (3) that Markonni's continued possession of the bag ripened into an unlimited seizure which under the fourth amendment required probable cause. Probable cause did not arise, however, until the dog alerted; by that time, Puglisi contends, the seizure, and therefore the subsequent search warrant, were unlawful.

We hold that Markonni's initial encounter with Puglisi was a consensual encounter, not a *Terry* seizure, and thus did not have to be founded on reasonable suspicion. We further hold that the removal of Puglisi's luggage from the Delta baggage cart was a limited seizure of luggage under *Terry* and *United States v. Place,* —— U.S. ——, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and that it was supported by articulable and reasonable suspicion. One hundred and forty minutes thereafter, when the dog alerted, Markonni had probable cause to search the bag; by then, however, the limited seizure had become an unlimited one. The 140 minutes, combined with the intrusiveness on Puglisi's right to the possession of the bag, rendered this seizure unreasonable under the standards set forth in *Terry* and *Place.* We therefore hold that the cocaine found in Puglisi's bag should have been suppressed.

## II.

### The Initial Encounter

■ Puglisi contends, as he did in the district court, that Markonni's initial encounter with him constituted a stop that did not meet the *Terry* standard; it was not based on reasonable suspicion. We have prescribed specific rules for airport stops. *United States v. Berry,* 670 F.2d 583 (5th Cir. Unit B 1982) (en banc). There are three levels of police-citizen encounters: encounters in which the police officer seeks to communicate with the citizen without the coercion or detention proscribed by the

fourth amendment; brief *Terry*-type seizures that must be founded on reasonable suspicion; and full scale arrests, requiring probable cause. *Id.* at 594–95. *Accord, United States v. Jensen,* 689 F.2d 1361, 1363 n. 2 (11th Cir.1982); *United States v. Elsoffer,* 671 F.2d 1294, 1297 (11th Cir.1982). To define a seizure in an airport-stop context, we adopted, in *Berry,* the test Justice Stewart prescribed in his plurality opinion in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). A seizure occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." We stressed that courts should scrutinize the record carefully to ensure that the totality of the circumstances shows an absence of coercion unless the police have reasonable suspicion or probable cause.[4]

■ *Berry* points to some specific factors that may indicate whether a police-citizen contact is consensual or a seizure. Blocking a citizen's path or impeding his progress is an indicator that a seizure has occurred. Similarly, retaining his ticket or identification may indicate a seizure if his freedom is thereby restrained. 670 F.2d at 597. An officer's statement that the individual is the focus of an investigation or that a truly innocent person would cooperate with police tends to indicate lack of consent and therefore a seizure. The Supreme Court has suggested still other factors: the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect; and the language and tone of voice of the police. *Id.* at n. 12, citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J., plurality opinion).

---

4. A Supreme Court majority recently endorsed this *Berry/Mendenhall* test in *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

The initial encounter between Markonni and Puglisi contained none of these indicia of a seizure or any others. Markonni's testimony that he initially approached Puglisi from the side and spoke always in normal conversational tone was uncontradicted. Markonni asked permission to speak with Puglisi; he did not simply walk up to Puglisi and begin asking questions. Markonni never held Puglisi's ticket or identification longer than 20–30 seconds. He asked for Puglisi's ticket twice and driver's license once, returning them promptly each time. Markonni did not tell Puglisi that he was a suspected drug courier or request Puglisi to accompany him to the DEA office. Markonni informed Puglisi that he could refuse to allow a search of his person or bag, and Puglisi refused to let Markonni search his bag. Puglisi consented, however, to a search of his person, spontaneously and voluntarily assuming the police search stance, leaning forward against a wall with arms and legs spread. Until the frisk, Markonni never physically touched Puglisi.

Markonni's conduct did not violate the *Berry/Mendenhall* proscription; on the totality of circumstances a reasonable person would have known he was free to leave or to cut off questioning. The initial encounter between Puglisi and Markonni clearly did not constitute a seizure.[5] Directly on point is *United States v. Jensen*, 689 F.2d 1361 (11th Cir.1982) (per curiam) (no seizure when DEA agent approached suspect, asked for and returned ticket and identification, asked if suspect was carrying drugs, asked to search suspect and suitcase). *See also United States v. Waksal*, 709 F.2d 653 (11th Cir.1983) (stressing that key facts rendering encounter a seizure were retention of ticket until suspect had agreed to search, and suspect not advised of right to refuse consent);

*United States v. Sanford*, 658 F.2d 342, 343–44 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1618, 71 L.Ed.2d 852 (1982) (finding no seizure or "stop"); *United States v. Pulvano*, 629 F.2d 1151, 1152–54 (5th Cir.1980) (finding no seizure or "stop").

## III.

### The Seizure of the Suit Bag

A. *Terry, Place,* and Seizure of Luggage

Puglisi contends that (1) the initial stop and seizure of his suit bag was not supported by reasonable suspicion and (2) the length and intrusiveness of the detention of the luggage caused the detention to ripen into a "full seizure" that could be justified only by probable cause. These claims must be analyzed in light of *Terry* and *Place*, *supra*.

*Terry* permits a forcible seizure and pat down of a suspect for weapons, if the police officer has a reasonable, articulable, suspicion that criminal activity is afoot. Because the seizure is not based on probable cause, it may only be a brief stop and frisk for the purpose of protecting the officer and bystanders. In the parlance of legal commentators, this seizure is known as the "Terry stop." *See, e.g.,* 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.2 (1978 & 1983 Supp.) [hereinafter *LaFave Treatise*]. In *Terry* the police briefly detained and frisked a person believed to be carrying a handgun. The Supreme Court struck a balance between the suspect's interest in avoiding the pat down and interference with his freedom of movement, and society's interest in safety and proper police investigation. Concluding that society's interest in preventing crime outweighed the

---

**5.** As we stated in *Berry*, to transform all police-citizen contact into an adversarial fourth amendment encounter would slight the common interest of police and citizens in safety and vigorous law enforcement. We noted that the ability of police to question individuals is essential to that interest, because "[w]ithout such investigation those who were innocent might be falsely accused, those who were guilty might

wholly escape prosecution, and many crimes would go unsolved." 670 F.2d at 591, *citing Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2046. Indeed, the Supreme Court has stated, "[i]t is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." *Miranda v. Arizona*, 384 U.S. 436, 477–78, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966).

minimal intrusion on Terry, the Court upheld the admission in evidence of the pistol found during the pat down. The Court has extended the rationale behind *Terry* and its balancing test. *See Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (limiting detention of occupants while authorities search premises pursuant to a valid search warrant); *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (stop near border of vehicle suspected of transporting illegal aliens); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (brief investigative stop near border for question about citizenship and immigration status); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (forcible stop of suspect to investigate tip that he was armed and carrying narcotics).

In *United States v. Place,*[6] *supra,* the Supreme Court extended the scope of the *Terry* stop to luggage. The Court held that if the police possess reasonable suspicion to stop someone under *Terry,* they may also seize any luggage he may be carrying, for a brief, investigatory purpose. Even though such detention restricts the possessor's freedom of movement, the seizure is permissible if the police possess reasonable, articulable suspicion, in view of the totality of the circumstances, that the luggage contains contraband or evidence of a crime. *Place* requires the same test as *Terry:* a court must weigh the intrusiveness of a limited seizure of the individual against society's interest in detection and prevention of crime. The *Place* Court stated:

The exception to the probable-cause requirement for limited seizures of the person recognized in *Terry* and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of "the Fourth Amendment's general proscription against unreasonable searches and seizures...." We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

—— U.S. at ——, 103 S.Ct. at 2642, citing *Terry,* 392 U.S. at 20, 88 S.Ct. at 1979. *See also* 3 LaFave Treatise at 27. A court analyzing a fact situation under *Place* must determine (1) whether the seizure of luggage was based on reasonable suspicion and, if so, (2) whether the seizure was of such a duration and so restricted the possessor's freedom of movement that, given the circumstances, the seizure may only be supported by probable cause.

 Luggage, unlike a person, has no fourth amendment rights. The fourth amendment, accordingly, is implicated only when a police seizure of an item impairs a person's possessory interest, or a search impairs a person's reasonable privacy interest

---

**6.** In *Place,* DEA agents in the Miami airport suspected that the defendant was a drug courier. They received his consent to search his two checked suitcases. But, because his flight to New York City was about to depart, they did not conduct the search. Instead, they phoned DEA agents at LaGuardia Airport and apprised them of the situation and that Place had fictitious addresses and a fictitious phone number on his suitcases. The New York agents approached Place as he retrieved his bags from baggage claim. He told them that he had spotted them as "cops" as he was deplaning. When informed that he was suspected of carrying narcotics, Place replied that the Miami agents had already surrounded him and searched his luggage. The New York agents,

of course, knew this to be false. The agents procured Place's driver's license and ticket. They were both issued in the same name; a license check showed no offenses. Place then refused to consent to a search of his luggage. The agents informed Place they were taking his luggage to a federal judge to obtain a search warrant and Place was free to accompany them. Place declined, but obtained from one of the agents telephone numbers at which the agents could be reached. The agents then took the bags to Kennedy Airport and 90 minutes after the seizure a detector dog alerted to the luggage. *See* a brief but cogent analysis of *Place* in LaFave, *Supreme Court Report,* 69 A.B.A.J. 1740 (1983).

in the item.[7] We add to Justice Stewart's pronouncement in *Katz v. United States:*[8] the fourth amendment protects people, not places, *or things.* The fourth amendment applies to places and things only when people have reasonable privacy or possessory interests in them. *Katz,* 389 U.S. at 353, 88 S.Ct. at 512; *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977); *accord, Place,* —— U.S. at ——, 103 S.Ct. at 2643. In the airport setting, privacy and possessory interests in luggage are often high. The traveler often has his most important and private possessions in his suitcase, and may want to shield them from the prying eyes of strangers, especially the government. At the same time, the traveler may wish to retain possession of his luggage lest he arrive at his destination with only the clothes on his back. Air travelers for many reasons may simply be unable to function if they arrive without their luggage. If a DEA agent seizes an air traveler's luggage, the seizure may be, for all practical purposes, tantamount to a seizure of the traveler himself, even an arrest. 3 LaFave Treatise 61. A person may not be arrested without probable cause, however; nor may he be "stopped" against his will, for even a moment, without reasonable suspicion.[9] *Terry; Berry, supra.* Because police seizure of an air traveler's luggage may effectively stop or even arrest the traveler, the fourth amendment applies to protect the traveler's reasonable possessory interest in his luggage.

The Supreme Court in *Place* relied upon these concepts of privacy and possessory interests to determine whether the seizure of Place's luggage violated his fourth amendment rights. The Court held that no privacy interests were implicated because the agents did not open the luggage; they merely subjected it to a dog sniff, which intrudes on no reasonable expectation of privacy.[10] The Court held, however, that Place's possessory interest in his luggage

7. As Justice Stevens pointed out in *Texas v. Brown,* —— U.S. ——, ——, 103 S.Ct. 1535, 1546, 75 L.Ed.2d 502 (1983), the fourth amendment

> protects two different interests of the citizen—the interest in retaining possession of property and the interest in maintaining personal privacy. A seizure threatens the former, a search the latter. As a matter of timing, a seizure is usually preceded by a search, but where a container is involved the converse is often true. Significantly, the two protected interests are not always present to the same extent; for example, the seizure of a locked suitcase does not necessarily compromise the secrecy of its contents, and the search of a stopped vehicle does not necessarily deprive its owner of possession.

*Id.* (concurring in the judgment); *accord, Place,* —— U.S. at ——, 103 S.Ct. at 2648–49. *See, e.g. United States v. Goldstein,* 635 F.2d 356 (5th Cir. Unit B) *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981). In that case we held that removal of a suspect's luggage from a baggage cart for an immediate on-the-spot sniff by a detector dog did not implicate the fourth amendment. The sniff was held not a search or any intrusion on privacy interests. The suspect's possessory interests were not impaired by the seizure because he had relinquished possession to the airline for a number of hours and had the dog not alerted the luggage would have been immediately returned to the baggage cart with no delay, injury, or impairment. Indeed, the own-

er would have been oblivious to the entire occurrence.

8. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). For a full exegesis of *Katz,* see 1 *LaFave Treatise* 221–40. The Supreme Court has interpreted *Katz* as holding "wherever an individual may harbor a reasonable 'expectation of privacy' ... he is entitled to be free from unreasonable governmental intrusion." *Terry v. Ohio,* 392 U.S. 1, 9, 85 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (citations omitted). *See Rakas v. Illinois,* 439 U.S. 128, 152, 99 S.Ct. 421, 435, 58 L.Ed.2d 387 (1978): "The ultimate question, therefore, is whether one's claim to privacy from governmental intrusion is reasonable in light of all the surrounding circumstances."

9. We emphasize that this is a normal airport stop case, not a border case or a case where the suspect has presented himself for aircraft boarding with carry-on luggage. These latter two situations often involve different fourth amendment standards. *See, e.g., United States v. Himmelwright,* 551 F.2d 991 (5th Cir.) *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); *United States v. Skipwith,* 482 F.2d 1272 (5th Cir.1973).

10. *Place* held that the sniffing of luggage by a narcotics detector dog is not a search. —— U.S. at ——, 103 S.Ct. at 2649. Puglisi does not contend that such action amounted to a search in this case.

was impermissibly intruded upon because DEA agents at LaGuardia, who had known for hours that he was arriving, seized Place's luggage from his person and told him they were taking it to a judge, while they actually took it to Kennedy Airport where a full ninety minutes later a dog alerted to the presence of narcotics. Although the DEA agents possessed reasonable suspicion, their conduct had too severe an impact upon Place's interest in possessing his luggage and carrying it with him on the remainder of his trip. —— U.S. at ——, 103 S.Ct. at 2649. The Court suggested that a briefer and less intrusive [11] seizure, accompanied by DEA diligence in procuring a detector dog, could have passed constitutional muster. *Id.*

The Court rejected Place's contention that once his luggage was seized disposession became absolute and required probable cause. Instead, the Court held that police intrusion on possessory and privacy interests in "personal effects can vary both in its nature and extent." *Id.* at ——, 103 S.Ct. at 2643. Because some intrusions can be brief and fairly innocuous—not severely interfering with an individual's right to travel freely with his luggage—the government's interest in halting drug traffic may predominate in the balance which *Terry* requires. Thus the *Place* Court held that while the DEA agents were entitled to a

brief and reasonable delay of Place's ability to travel unimpeded with his luggage, this interference, given the facts of the case, was too severe.

*Place* also makes clear that because the fourth amendment protects people, not things, courts should concern themselves with seizures of luggage only when those seizures impair the right of the possessor to freedom of movement with his luggage. In airport luggage cases, the traveler's possessory interest would be impaired if the seizure of his luggage were tantamount to a seizure of his person, whether actually, because he could not leave without his luggage, or constructively, as in the cases of Place and Puglisi, where travel plans required him to proceed without his luggage.[12] *Place* teaches that a seizure of luggage *qua* seizure, with no deleterious effects on the air traveler, is simply not a fourth amendment issue. This is in accord with a prior holding of this circuit, *United States v. Goldstein*, 635 F.2d 356 (5th Cir. Unit B) *cert. denied*, 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981). In that case we held that the removal of a suspect's luggage from a baggage cart for an immediate on-the-spot sniff by a detector dog did not implicate the fourth amendment. Neither the removal of the luggage from the cart nor the sniff by the dog impaired in

11. The Court suggested that a fairly unintrusive search would involve seizing the luggage from a third party to whom the owner had relinquished control, for the purpose of conducting an on the spot inquiry using a detector dog. *Id.* at ——, 103 S.Ct. at 2643. Seizing the luggage from the owner himself, subjecting it to a more intrusive inspection than a dog sniff, and keeping the parcel for more than a few minutes would impinge more seriously upon possessory and privacy interests, thus requiring a greater governmental interest in the seizure.

12. In other words, seizing a person's luggage may actually seize the person because, for many reasons, he may be able to go nowhere without it. Such a seizure clearly implicates the fourth amendment, and could be the equivalent of either an arrest or a *Terry* stop, depending upon the circumstances. *See* discussion of *Berry*, *supra* at 783–784. Seizing a person's luggage may not actually seize the person because he may, for many reasons, de-

cide to proceed on his trip and leave his luggage behind. Although the person is not actually seized, this conduct clearly implicates the fourth amendment because the traveler's possessory rights in his luggage are severely impaired. Accordingly, this impairment is a "constructive" seizure, for purposes of bringing the fourth amendment to bear.

In this case the district court found, and the government contends on appeal, that the seizure of the suit bag did not constructively seize Puglisi because his possessory interests in his suit bag were not impaired. We reject this contention. He boarded one flight, departed, returned, and was waiting to board another, without his bag. He was not given a receipt or even a phone number that he might use to regain possession. Had his possession of the suit bag not been disrupted, he might have changed air carriers after the aborted flight or left the airport altogether.

any way the owner's possessory or privacy interests. Privacy interests were not affected because the sniff was not a search. *Id.* at 361. The owner's possessory interests were not impaired because he had surrendered control of the luggage to the airline for some four and one-half hours, and the removal and inspection took about four minutes. The removal and inspection would not, in any way, have caused Goldstein or his luggage to miss or be late for the flight; in fact, had the dog not alerted, Goldstein would have been totally oblivious to the entire occurrence.

The facts of the instant case and *Place* are different from those in *Goldstein,* however. Here, and in *Place,* the seizure of luggage impaired the freedom of the owner to continue unimpeded upon his travels, and thus implicated the fourth amendment. In such a case:

> The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained. Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or arrange for its return.[13]

*Place,* —— U.S. at ——, 103 S.Ct. at 2645 (citations omitted). The *Place* Court also stated that "Although we decline to adopt any outside time limit for a permissible *Terry* stop, we have never approved a seizure *of a person* for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case." *Id.* (emphasis added), citing ALI Model Code of

Pre-Arraignment Procedure § 110.2(1) (1975) (recommending a maximum of twenty minutes for stopping a person under *Terry.*) The inquiry under *Place,* then, focuses on the seizure of persons, through their luggage.[14]

The Court in *Place* declined to put an outside time limit on a permissible seizure of luggage based on reasonable suspicion. For time even to be relevant, the seizure of luggage must have actually or constructively seized the person, as it did in *Place.* A *Place* seizure, just like a *Terry* stop, must be a *minimal intrusion. See United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). *Place* establishes that the amount of time the owner is actually or constructively detained is a good yardstick for assessing the reasonableness of a reasonable suspicion seizure. A court should also look to the severity of the disruption in the suspect's travel plans, whether the luggage was seized from the suspect's person [15] or in a manner likely to cause him great embarrassment, and, as in *Place,* whether the length of the seizure was unnecessarily extended by lack of police diligence.

### B. *The Initial Seizure of Puglisi's Bag Was Supported by Reasonable Suspicion*

The brief seizure of luggage, which interferes with the owner's freedom of movement, permissible under *Place,* must be based on a reasonable, articulable suspicion that a crime is being, or soon will be, committed. Although Markonni did not possess this suspicion when he first approached Puglisi, by the time he directed the Delta employee to remove the suit bag from the baggage cart, he possessed the

---

**13.** We are aware that in *Place* the Court stressed that the luggage was seized from *Place's* person, while Puglisi's luggage was seized from a baggage cart. Under the fourth amendment, we must assess an individual's reasonable expectation that he may be free from official intrusion. A person's ability to travel unimpeded with his luggage may be impaired even though that luggage is not seized from his person. *But Cf. Goldstein, supra.* The fact that the luggage was seized from the possessor's person goes only to the intensity of

the interference. Moreover, in this case Markonni personally confronted Puglisi with the luggage and then physically removed it from his presence. This was a personal confrontation in a public place, similar to seizing luggage from a suspect's person.

**14.** *See supra* note 12.

**15.** *See supra* note 13.

requisite specific, articulable, and objective facts reasonably to suspect that Puglisi was carrying narcotics.

▪ The district court found ten specific facts that gave Markonni reasonable suspicion as a result of his first encounter with Puglisi at gate A19:[16] (1) Puglisi had just arrived from Ft. Lauderdale which, along with Miami and Palm Beach, was the most significant entrance point for marijuana, cocaine, and methaqualone in the United States; (2) Puglisi stared directly at Markonni as Puglisi entered the waiting area; (3) Puglisi walked through the waiting area and then turned and looked back at Markonni, who was still standing at the gate; (4) Puglisi's one-way ticket was reserved at 1:03 a.m. the morning of his flight; (5) the person who reserved the ticket left no callback number, even though Puglisi claimed that he had been staying with friends in Ft. Lauderdale for three days; (6) Puglisi paid cash for the ticket; (7) the ticket was not issued in his true name; (8) Puglisi did not have a good explanation why he was travelling under another name; (9) he assumed the classic search position spontaneously; and (10) he grew increasingly nervous as Markonni questioned him, to the point where he was having trouble breathing properly.

None of these facts, standing alone, was sufficient to give Markonni the reasonable suspicion needed to make a limited seizure of Puglisi's suit bag, but the test is whether considered *together* they gave rise to reasonable suspicion. *Terry,* 392 U.S. at 22–23, 88 S.Ct. at 1880–81; *see also Berry,* 670 F.2d at 601. Taking all these factors into consideration, especially Puglisi's inexplicable traveling under an alias, spontaneous assumption of the search position, and excessive nervousness, we think it clear that an experienced DEA agent, such as Paul Markonni, would have had reasonable suspicion that criminal activity was afoot.

Puglisi claims however, that *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), requires us to conclude that Markonni could not, as a matter of law, have reasonably suspected Puglisi on these facts. In *Reid,* the High Court addressed whether reasonable suspicion for a *Terry* stop of two air travelers had arisen when DEA agents noticed that the travelers had arrived in Atlanta on an early morning flight from Fort Lauderdale, had tried to conceal the fact that they were traveling together, and apparently had no luggage other than shoulder bags. The Court stated that these facts did not support reasonable suspicion. 448 U.S. at 441, 100 S.Ct. at 2754. *Reid* is quite distinguishable from Puglisi's case. The few factors that bore upon reasonable suspicion in *Reid* do not even begin to equal the ten facts leading to reasonable suspicion in Puglisi's case. *Accord, Sanford, supra* (reasonable suspicion for *Terry* stop of drug courier justified on fewer objective facts than instant case); *United States v. Herbst,* 641 F.2d 1161 (5th Cir. Unit B 1981) (unsatisfactory answers to agent's questions tipped scales to reasonable suspicion); *United States v. Bowles,* 625 F.2d 526 (5th Cir.1980) (*Terry* stop of drug courier justified on fewer and less suspicious objective facts than instant case); *United States v. Himmelwright,* 551 F.2d 991 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) (border search; reasonable suspicion justified on fewer objective facts than instant case).

### C. The Initial Seizure Became So Intrusive That It Required Probable Cause

Although Markonni possessed reasonable suspicion sufficient to seize Puglisi's suit bag and subject it to a fairly prompt exami-

---

**16.** The parties in their briefs spent an inordinate amount of effort discussing whether Puglisi fit the "drug courier profile," a somewhat shopworn amalgam of "primary" and "secondary" characteristics which are said to indicate whether a person is trafficking narcotics. While this concept may be helpful in some situations, it detracts from the proper test under *Place* and *Terry:* whether specific, articulable facts *in this case,* considered on the totality of circumstances, indicate reasonable suspicion. "The presence or absence of a particular characteristic on any profile is of *no* legal significance in the determination of reasonable suspicion." *Berry,* 670 F.2d at 600 (emphasis in original).

nation by a detector dog, he did not do so. Markonni could also have permitted the bag to go on to Las Vegas and phoned ahead to have a dog awaiting its arrival, but he did not. Instead, Markonni ordered the bag removed from the luggage cart, took the bag up to the terminal area to confront Puglisi, carried the bag to his office, stowed it there, and finally brought it back out to the baggage area for an examination by Sergeant Bandit, the detector dog. Markonni's seizure of the bag, carrying it back and forth, and storing it, took approximately 140 minutes. In the meantime, the owner of the bag had departed for Las Vegas without it. When his flight returned unexpectedly to the airport he obtained other airline accommodations and prepared to leave Atlanta once again without his baggage. Because of its effect on Puglisi, Markonni's seizure of the bag exceeded the brief investigative detention of luggage permissible under *Terry* and *Place*. This becomes clear when we analyze the impact of the seizure upon Puglisi's privacy and possessory interests in his suit bag.

### 1. Privacy Interests

Markonni did not subject the suit bag to any type of an examination other than a sniff by a detector dog. He did not open, weigh, measure, or X-ray the bag. Puglisi's legitimate interest in keeping his possessions away from the view of police and public was respected. Markonni, the other DEA agent, and the Delta employee did jointly confront Puglisi with the bag in the public waiting area outside gate A19. Although this encounter was no doubt embarrassing to Puglisi and could weigh in the fourth amendment calculus had it been used to coerce Puglisi's consent to a search, Markonni did not open or threaten to open the bag at the gate.

### 2. Possessory Interests

Puglisi was dispossessed of his luggage and his freedom to travel was impaired when he left gate A19. This situation continued as Puglisi rerouted himself to Las Vegas via Dallas/Ft. Worth. The impairing of an air traveller's reasonable possessory interest in his luggage is especially intrusive when the seizure causes him to depart without his luggage or miss his flight.[17] The former situation is most aggravating, can simply ruin a trip and is a sufficient interference in the traveler's possession of his luggage to constitute a constructive seizure of the traveler himself, regulated by the fourth amendment.[18] The latter situation is tantamount to an actual seizure of the person. Law enforcement agents making seizures on reasonable suspicion owe a special duty of diligence to ensure that a traveler's flight plans are not unnecessarily impaired. "[I]n assessing the effect of the length of the [traveler's] detention, we take into account whether the police diligently pursue their investigation." *Place,* —— U.S. at ——, 103 S.Ct. at 2645. Police diligence, then, weighs in the required balance between the public's interest in effective crime investigation and the interest of the traveler in proceeding unimpeded through the airport. In this case, Agent Markonni had approximately twenty-five minutes after reasonable suspicion arose to get a detector dog to sniff the luggage. Markonni may have been able to hold the luggage beyond twenty-five minutes if doing so would have been reasonable. As we noted above, whether a seizure is reasonable depends upon the intrusion into possessory and privacy interests, in light of police diligence and the alternatives open to the police in conducting the investigation.

Here, Markonni had a number of lesser intrusive means of conducting the investigation. First, he could have made certain that a detector dog was within a reasonable

---

**17.** In his brief on appeal, Puglisi correctly states that his case differs markedly from *Goldstein,* 635 F.2d 356, because in *Goldstein* the suspect's possessory interests in his luggage were in no way impaired. The Government's contention that *Goldstein* controls this case is thus misplaced. *See supra* text accompanying note 13.

**18.** *See supra* note 12.

distance from the airport. The record indicates that Markonni normally had the use of two detector dogs at the airport, but on the day in question the nearest dog handler and dog were at least ninety minutes away by car. Markonni's normal practice does not excuse this lack of diligence. Second, and more importantly, Markonni could have permitted Puglisi's suit bag to accompany the flight to Las Vegas, where agents could have had a detector dog waiting. Given the availability of these alternatives, Markonni acted unreasonably. He went beyond the narrow authority possessed by police to detain briefly luggage reasonably suspected to contain narcotics. The cocaine was discovered as a result of this illegal detention. Puglisi's motion to suppress should have been granted.

REVERSED.

CLARK, Circuit Judge, concurring:

I concur in the result and in Part III(C) of the opinion, which is the rationale for the result.