**UNITED STATES of America,**

v.

**Toka Michelle McDuffie WILLIAMS.**

**No. CR–02–83–N.**

United States District Court,
M.D. Alabama,
Northern Division.

April 21, 2003.

Andrew M. Skier, Montgomery, AL, Nicholas L. Howard, III, Auburn, AL, for Keith Ausborn, Jeffery C. Duffey, Law Office of Jeffery C. Duffey, Barry Elvin Teague, Joseph Peter Van Heest, Federal Defender, Middle District of Alabama, Maryanne Melko Prince, Russell T. Duraski, Maurice S. Bell, Amardo Pitters, A. Wesley Pitters, P. C., Bruce Maddox, Law Office of Bruce Maddox, Thomas Martele Goggans, Montgomery, AL, for defendant.

John T. Harmon, Todd A. Brown, U.S. Attorney's Office, Montgomery, AL, for U.S.

### ORDER

MYRON H. THOMPSON, District Judge.

This criminal case is before the court on United States Magistrate Judge Delores R. Boyd's recommendation that defendant Toka Michelle McDuffie Williams's motion to suppress be granted in part and denied in part and that her motion for release of money be denied. Both the United States and Williams have filed objections to the magistrate judge's recommendation. For the reasons that follow, the court will overrule the objections and adopt the recommendation.

### I.

On November 12, 2001, Williams arrived at the Montgomery, Alabama Airport around 11:00 for an 11:55 a.m. flight to Los Angeles on U.S. Air. The airline's computer selected her checked baggage for a random search, to which she consented. Upon opening Williams's bags, Beryl Thrasher, the gate agent, discovered large sums of money. Thrasher allowed Williams to proceed to the gate area, but promptly told her supervisor and airport-security-officer Joseph James of her discovery.

When James arrived at the ticket counter, Williams's bags were still open, revealing money inside opaque grocery-store-type plastic bags. James could not see the denominations of the money, and did nothing further to search Williams's bags; instead he summoned another police officer to go with him to speak with Williams. James left the bags in U.S. Air's custody.

Around 11:30 a.m., after being told by Officer James that they had found some large sums of money in her bags, Williams consented to James's request to go to an airport office and talk. James also asked Paul Gibson—who was suspected of being Williams's traveling companion because the two checked in together—to accompany him to the office. James did not place Williams or Gibson under arrest, handcuff them, or otherwise physically restrain them; he told them that they were not being detained and that, if they missed their flight, they would be re-booked on another.

At 11:45 or 11:50 a.m., James called the Montgomery Police Department (MPD). Officer Manning from MPD arrived shortly before noon, and he suggested involving the narcotics unit. The narcotics unit was

called, and narcotics agents S.C. Youngblood and W.E. Herman arrived at the airport around 12:30 p.m.

After James briefed him on the situation, officer Herman began a 20– to 30–minute taped interview of Gibson by advising him of his *Miranda* rights. Herman uncovered nothing connecting Gibson to Williams and allowed Gibson to leave with his bags. Beginning at 12:55 p.m., Herman interviewed Williams, first advising her of her *Miranda* rights and explaining to her that she was not under arrest and could leave at any time. During this interview, Williams made a number of statements about why she was traveling to Los Angeles, why she had so much cash with her, where she had bank accounts, and what her job was; Williams also told Herman how she met Gibson. According to Herman, these statements conflicted with Gibson's account of their acquaintanceship.

At 1:30 p.m., Herman summoned Rebecca Sparkman, who was also assigned to the federal drug task force, to the airport, because he thought Gibson and Williams had made inconsistent statements that provided enough for him to seize or detain Williams's money. Williams's bags were brought from the U.S. Air counter to the office where she was being held at this time. Officer Sparkman arrived at the airport at 2:15 p.m., whereupon she interviewed Toni Milton, Williams's business partner, whom Williams had called to the airport after missing her scheduled flight and other connections to Los Angeles.

Milton's interview produced other inconsistencies with Williams's earlier statements, which led to a second interview of Williams by officers Herman and Sparkman. At this interview, Williams again made statements inconsistent with what Milton had said; for example, Williams claimed that her boyfriend took her to the airport, while Milton said that she took Williams to the airport.

Between 5:00 and 5:30 p.m., after the second interview with Williams, the officers counted the money for the first time, and counted it again in an effort to reconcile the $ 97,800 Williams claimed she was carrying with the $ 97,330 counted by the officers. At 5:38 p.m., Sparkman gave Williams a receipt for $ 97,330 and told Williams that the money was being detained for investigation. Williams then left the airport with Milton. The next day, Sparkman made arrangements for a canine sniff of the currency; the canine alerted to the box with Williams's money inside.

II.

A. Motion to suppress currency

1.

■ Williams's motion to suppress asks the court to suppress the $97,330 in currency the police seized from her at the airport. In addressing this motion, the court must first determine if and when the confrontation between Williams and the various police officers turned from a consensual encounter, to which the fourth amendment does not apply, into a seizure of her person, to which the fourth amendment does apply. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968) ("Our first task is to establish at what point in this encounter the Fourth Amendment becomes relevant.") A seizure occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir.1984) (citation omitted).

In view of all the circumstances, a reasonable person in Williams's situation would have felt that she was not free to leave after her interview with officer Herman ended without her bags being re-

turned to her. The record is clear that, up to that point, Williams's cooperation with the officers was entirely consensual. Not only did Williams consent to the original search of her bags, she also agreed to accompany officer James to the airport office under no duress whatsoever: James did not in any way physically restrain her and told her that she was not being detained. *Id.* (discussing factors that distinguish a consensual encounter from a seizure). Although Williams missed her original flight, scheduled for 11:55, James assured her that she would be booked on another flight. There is no evidence in the record that Williams asked to leave or to have her luggage returned to her.

█ After her interview with officer Herman, however, the totality of the circumstances surrounding Williams's detention changed. Herman first interviewed Gibson and, finding nothing linking Gibson with Williams, returned his bags and let him continue on to Los Angeles. After Herman interviewed Williams, however, he did not return her bags; instead, he summoned officer Sparkman to the airport. A reasonable person in Williams's situation, noticing Herman's different treatment of Gibson and herself, would have believed that she was not free to leave, especially because the officers continued to detain her luggage. *United States v. Place,* 462 U.S. 696, 708, 103 S.Ct. 2637 (1983) ("Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary."). This finding is also supported in the record by the fact that, after her first interview with Herman, Williams called her business partner, Milton, to the airport to take her home; Williams had missed her scheduled flight and other connections to Los Angeles. Additionally, James testified that, had he been with Williams in the office, with

Montgomery Police officers repeatedly being called and Officer Ingram watching constantly, he would not have felt free to take the bags and leave even if he had wanted to. Because a reasonable person in Williams's situation would not have felt free to leave at that point, the court finds that Williams and her luggage were seized for fourth amendment purposes at the conclusion of her interview with Herman.

### 2.

It is undisputed that the officers never obtained a warrant to stop Williams or seize her luggage. Thus, having found that a fourth-amendment seizure occurred when Williams's interview with officer Herman ended, the court must next determine if and when the officers developed a reasonable articulable suspicion that Williams was carrying contraband or evidence of a crime, which would allow them to perform a limited search and seizure without a warrant. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880 (holding that limited searches and seizures without a warrant may be justified by specific and articulable facts that reasonably warrant the intrusion).

█ By the time Williams's interview with Herman ended, around 1:30 p.m., Williams had told Herman that she was taking $97,800 in cash to Los Angeles in order to buy a car and then drive to Las Vegas with a friend to gamble with the remaining money, and that she had saved this money through her work as the co-owner of a hair salon. Notably, at that time, Herman had no objective reason to doubt the veracity of Williams's explanation for why she was carrying the money or to suspect her of any wrongdoing. The only "evidence" he had of any crime was the fact that Williams was carrying a large sum of money and a few inaccuracies between Williams and Gibson's accounts of

how they met, a meeting that had no connection whatsoever to the money in Williams's bags. Thus, at the time of the illegal seizure, the officers had no reasonable, articulable suspicion that Williams was carrying contraband or evidence of a crime, and the seizure was therefore not justified under the *Terry* exception to the warrant requirement. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880 ("[I]n determining whether the officer acted reasonably ... due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."); *see also United States v. Puglisi,* 723 F.2d 779, 786 (11th Cir.1984) (stating that a person may not be " 'stopped' against his will, for even a moment, without reasonable suspicion.").

■ Even if the facts within Herman's knowledge at 1:30 p.m.—that Williams was traveling with large sums of money in grocery-store-type plastic bags and that Williams and Gibson's accounts of how they met were inconsistent—did constitute reasonable articulable suspicion, permitting a limited seizure of Williams and her luggage under the *Terry* exception to the warrant requirement, Williams's motion to suppress must still be granted because the length of her detention far exceeded that allowed under *Terry.* Both the Supreme Court, in *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and the Eleventh Circuit Court of Appeals, in *United States v. Puglisi,* 723 F.2d 779 (11th Cir.1984), have analyzed airport stops and seizures similar to the one at hand. As the Supreme Court held in *Place,* "when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains [contraband], the principles of *Terry* and its progeny could permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provid-

ed that the investigative detention is properly limited in scope." 462 U.S. at 706, 103 S.Ct. at 2644. In that case, the Supreme Court found that "length ... alone" of a 90–minute detention of the defendant's luggage precluded "the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* at 709, 103 S.Ct. at 2645. And in *Puglisi,* the Eleventh Circuit looked at the time the defendant was detained, the severity of the disruption to his travel plans, how the luggage was seized, and whether the length of the seizure was unnecessarily extended by lack of police diligence, 723 F.2d at 788, to find that a 140–minute detention of the defendant's luggage without prompt examination by a detector dog exceeded the scope of a stop justifiable under *Terry.*

In this case, the officers' seizure of Williams and her luggage clearly disrupted her travel plans: not only did she miss her original flight, but she missed all subsequent flights that same day. The magistrate judge also found evidence of a lack of police diligence, specifically the fact that the police did not seek to have a drug-sniffing dog examine Williams's bags until the following day. Finally, and most importantly, Williams was detained against her will for 4 hours, from approximately 1:30 until 5:30 p.m., at which point she left the airport, still without her money. These circumstances surrounding the seizure of Williams and her luggage are much more egregious than those surrounding the seizures found to violate the fourth amendment in *Place* and *Puglisi;* as such, the officers' investigative detention of Williams far exceeded that allowable under the *Terry* exception to the warrant requirement.

3.

The government argues, however, that the officers developed probable cause to seize Williams's luggage, and that the sei-

zure was therefore permissible under a number of exceptions to the warrant requirement. *See, e.g., Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987) (holding probable cause required to invoke the plain view doctrine); *United States v. Tobin,* 923 F.2d 1506, 1510 (11th Cir.1991) (stating that warrantless searches are allowed where both probable cause and exigent circumstances exist).

The Eleventh Circuit, however, has specifically held that large sums of money, "absent some evidence connecting specifically to illegal drugs ... [provide] no reasonable basis for believing that the money is substantially linked to an illegal exchange of a controlled substance." *United States v. $121,100.00 in United States Currency,* 999 F.2d 1503, 1506 (11th Cir.1993) (holding that a large amount of currency, standing alone, is insufficient to establish probable cause for forfeiture). As the record shows, between 11:30 a.m. (when Williams was originally stopped) and 1:00 p.m. (when Officer Herman began his interview), the officers had no reason other than the currency in her bag to suspect Williams of criminal activity. Even after that interview, at 1:30 p.m., the officers knew only of the money and some inconsistencies between Williams and Gibson's statements about how they knew one another. And at 5:30 p.m., after Williams had been detained against her will for four hours, all the officers had added to this knowledge was that Williams and Milton had given conflicting statements about how Williams got to the airport and about the particulars of their business relationship, such as where they had bank accounts and how they split the partnership proceeds. Thus, after six hours of investigation, while there were some discrepancies that surfaced during the officers' interviews of Gibson, Milton, and Williams, the officers still lacked probable cause to connect Williams's currency to any crime.

Indeed, it is unclear whether the officers at any time developed probable cause to link Williams's currency with a crime. While the magistrate judge found that it was only the next day, when the drug-sniffing dog alerted to Williams's money, that the officers developed probable cause to believe Williams's money was contraband or evidence of a crime, that finding is questionable in light of the Eleventh Circuit's decision in *United States v. $242,484.00,* 318 F.3d 1240 (11th Cir.2003). In that case, the appellate court found that "[t]he probative value of dog alerts to the smell of narcotics on currency has been called into question of late ... The dog alert, at best, tells us that this currency (like most circulated currency) may have been exposed, at some point, to narcotics." *Id.* at 1246. Applying that logic to the case at hand, the officers had little more, if anything at all, after the dog sniff than they did before it, and therefore never developed probable cause to connect Williams's currency to any crime. Without probable cause, the government cannot justify the seizure of Williams's currency on either the plain view or the exigent circumstances exception to the warrant requirement, *Hicks,* 480 U.S. at 326, 107 S.Ct. at 1153 (holding probable cause required to invoke the plain view doctrine); *Tobin,* 923 F.2d at 1510 (stating that warrantless searches are allowed where both probable cause and exigent circumstances exist), and therefore the government had no legal basis upon which to seize Williams's currency.

**B. Motion to suppress statements**

**1.**

In Williams's motion to suppress, she also asks the court to suppress statements she made at the airport on November 12, 2001, as fruit of the poisonous tree of the illegal seizure. In *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416,

9 L.Ed.2d 441 (1963), the Supreme Court applied the exclusionary rule to verbal statements, finding that "verbal evidence which derives . . . immediately from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." Thus, the court must suppress those statements by Williams that derived immediately from the officers' unlawful seizure in this case.

■ For the reasons described previously, those statements that Williams made to officer Herman in her first interview should not be suppressed because they did not derive from any unlawful seizure of Williams or her luggage. Through that first interview, Williams's cooperation with the officers was entirely consensual; she consented to the original search of her bags, to accompany officer James to the airport office, and to answer Herman's questions after he read her *Miranda* rights to her as a precaution. At no time was she physically restrained, and James explicitly told her that she was not being detained and that, if she missed her original flight, she would be booked on another flight. It was only at the end of that interview, when Williams was not released as Gibson had been, that a reasonable person would have not felt free to leave and that Williams and her luggage were illegally seized. Thus, it cannot be said that Williams's statements to Herman in her original interview with him were the fruits of any illegal seizure, and therefore they are not due to be suppressed.

■ What began as a consensual encounter between Williams and law-enforcement officials, however, became an illegal seizure of Williams's person and her luggage when her first interview with Herman ended and he did not return her luggage nor affirmatively allow her to continue her trip to Los Angeles. As described above, at 1:30 p.m., the officers did not possess reasonable, articulable suspicion that Williams's money was contraband or evidence of a crime; additionally, they gathered no new information between 1:30 and 2:15 p.m., when officer Sparkman arrived and began to interview Williams's business partner. As such, Williams was illegally seized and held for some time without a warrant and without the reasonable, articulable suspicion that would justify such a seizure under *Terry*. Because she was illegally seized and later interviewed, any statements Williams made at that second interview with Herman and Sparkman were a product of the illegal seizure at 1:30 p.m., and, as such, should be suppressed.

2.

The government makes two arguments for why Williams's statements should not be suppressed even though they followed an illegal seizure. First, it argues that Williams's statements should not be suppressed because she was never placed into custody. Second, the government argues that Williams's statements should not be suppressed because she was given *Miranda* warnings. Essentially, the government is arguing that, because Williams was never in custody and was given *Miranda* warnings, she consented to make the statements.

■ As the Eleventh Circuit has held, "[f]or consent given after an illegal seizure to be valid, the government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure." *United States v. Santa,* 236 F.3d 662, 676 (11th Cir.2000). This second requirement focuses on causation: "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguish-

able to be purged of the primary taint." *Id.* at 677 (*quoting Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417).

██ In this case, the only evidence the government has presented to distinguish its illegal seizure of Williams from her subsequent verbal statements is that she was not placed into custody and that Herman advised Williams of her *Miranda* rights. This is simply not enough to support the government's burden. Even without placing Williams into formal custody, the officers, unable to produce any reasonable, articulable suspicion to detain Williams and her luggage, still seized her illegally for fourth-amendment purposes. If Williams had been placed into formal custody, the officers would have been required to give her *Miranda* warnings. *See, e.g., Purvis v. Dugger,* 932 F.2d 1413, 1417–18 (11th Cir.1991). Because she was never placed into custody, the *Miranda* warnings were given through an excess of caution. As the Eleventh Circuit has explained, "*Miranda* warnings do not, without more, dissipate the taint of an illegal seizure." *Santa,* 236 F.3d at 678. Thus, the government has failed to produce enough evidence to establish that Williams's consent to be interviewed was not a product of the officer's illegal seizure of her and her luggage.

### C. Motion for release of money

██ Finally, Williams moves the court for release of her money. The magistrate judge has already entered an order authorizing the United States to hold the money pursuant to 21 U.S.C.A. § 853(e)(1) (protective orders) and 18 U.S.C.A. § 983(a)(3)(B)(ii)(II) (forfeiture complaint). Even though Williams's money was seized illegally and cannot be used against her as evidence, the government has statutory authority to retain Williams's money pending resolution of this case. As such,

Williams's motion for release of money will be denied.

### III.

Upon consideration of the recommendation of the United States Magistrate Judge, entered on January 21, 2003 (Doc. no. 192), and after an independent review of the file, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) The parties' objections, filed February 7, 2003 (Doc. nos. 203 & 204), are overruled.

(2) The recommendation of the United States Magistrate Judge, entered on January 21, 2003 (Doc. no. 192), is adopted.

(3) Defendant Toka Michelle McDuffie Williams's motion to suppress, filed September 12, 2002 (Doc. no. 96), is granted to the extent that the $ 97,330 seized from defendant Williams's checked luggage and the statements that defendant Williams made to officers during her detention at the Montgomery Regional Airport after 1:30 p.m. on November 12, 2001, are suppressed as evidence, and the motion is denied in all other respects.

(4) Defendant Williams's motion for release of money, filed September 12, 2002 (Doc. no. 96), is denied.