[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13253

_____

ERIC ANDRE,
CLAYTON ENGLISH,

Plaintiffs-Appellants,

*versus*

CLAYTON COUNTY, GEORGIA,
CHIEF OF THE CLAYTON COUNTY
POLICE DEPARTMENT,
AIMEE BRANHAM,
MICHAEL HOOKS,
TONY GRIFFIN,
individually and in their official capacities
as police officers of the Clayton County
Police Department, et al.,

2                   Opinion of the Court                   23-13253

                                           Defendants-Appellees,


C. SMITH,
individually and in his official capacity
as a police sergeant of the
Clayton County Police Department,

                                                  Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cv-04065-MHC

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

BRANCH, Circuit Judge:

Clayton County, Georgia has a law-enforcement practice of selectively stopping airline passengers on the jet bridge as they attempt to board departing flights out of Hartsfield-Jackson Atlanta International Airport ("Hartsfield-Jackson"). All of the stops here occurred in the narrow and confined space of the jet bridge after the passengers had presented their boarding passes and the gate agent cleared them to board. During those stops inside the jet bridge, officers request and hold onto the passengers' identification

and boarding passes while they ask questions. Among other things, the officers ask if the passengers are carrying drugs and if they can search the passengers' luggage. This appeal requires us to decide the constitutionality of that practice.

Eric André and Clayton English ("plaintiffs") alleged that when Clayton County police officers stopped them as part of that practice, the officers violated their Fourth Amendment rights to be free from unreasonable searches and seizures. Plaintiffs further alleged that the stops were based on their race in violation of their equal-protection rights. Defendants in this case are several individual officers who conducted or supervised the stops ("the individual defendants") and Clayton County (all collectively "defendants").

The district court dismissed all of plaintiffs' claims for failure to plausibly allege any constitutional violations and granted qualified immunity to the individual defendants. We conclude, however, that plaintiffs plausibly alleged that Clayton County subjected them to unreasonable searches and seizures. Accordingly, after careful review and with the benefit of oral argument, we reverse the dismissal of plaintiffs' Fourth Amendment claims against Clayton County and affirm the remainder of the district court's dismissal.

4                    Opinion of the Court                    23-13253

## I.    Background

In 2022, plaintiffs brought this suit.  According to plaintiffs' operative complaint,[1] their claims arise out of "the Clayton County Police Department's ('CCPD') operation of an 'interdiction' program" (the "drug interdiction program") at Hartsfield-Jackson. Defendants' drug interdiction program "consists of armed CCPD officers and Clayton County District Attorney's Office ('CCDAO') investigators waiting in jet bridges . . . to selectively intercept passengers, take their boarding passes and identifications, interrogate them before they board their flights, and search their carry-on luggage, all in the name of combatting drug trafficking." Plaintiffs alleged that although "CCPD calls these stops 'consensual encounters' and 'random,'" the stops "rely on coercion, and targets are selected disproportionately based on their race."

Plaintiffs are two black celebrities who were subjected to the drug interdiction program.  In 2020, English flew from Atlanta to Los Angeles for work.  English cleared both TSA security and the boarding pass check by the gate agent.  After being cleared to board by the gate agent, English entered the confined and narrow jet bridge to board his flight when CCPD officers[2] stopped him on the jet bridge.  The officers flashed their badges and asked English

---

[1] Because this appeal reaches us on a motion to dismiss, we accept as true the factual allegations in the complaint.  *Meshal v. Comm'r, Ga. Dep't of Pub. Safety*, 117 F.4th 1273, 1285 (11th Cir. 2024).

[2] Plaintiffs alleged that these officers were individual defendants Kayin Campbell and Tony Griffin.

whether he was carrying any illegal drugs. English denied carrying illegal drugs. English "understood that he was not free to leave and continue his travel while the officers were questioning him." Then, "the officers instructed Mr. English to step to the side of the jet bridge." English complied and "understood that he did not have any choice but to comply." The officers then stood on either side of English, "effectively blocking his path onto the plane," and asked English to "hand over his ID and boarding pass." English "understood that he did not have any choice." The officers again asked English if he was carrying illegal drugs and asked about English's travel to Los Angeles. Then, while "the officers continued to retain Mr. English's ID and boarding pass, one officer stated that he wanted to search Mr. English's carry-on luggage." "Believing he had no choice, Mr. English acquiesced." After searching English's luggage, the officers returned his ID and boarding pass and told English he was free to leave. "Throughout the encounter, Mr. English was worried that if he said anything the officers perceived as 'out of line,' he would not be allowed to board the plane or reach his destination."

André had a similar experience. In 2021, André boarded a flight from Charleston, South Carolina, bound for Atlanta. From there, André would board his connecting flight home to Los Angeles. In Atlanta, André lined up to board when his group was called. He was the only black passenger in the group. After being cleared by the gate agent to board, André entered the jet bridge.

6                    Opinion of the Court                    23-13253

Inside the jet bridge, a CCPD officer and CCDAO investigator[3] obstructed André's path.  The officers flashed their badges and began asking André if he was carrying any illegal drugs, such as "cocaine, methamphetamine, prescription drugs that were not prescribed to him by a doctor, or other narcotics."  André denied carrying illegal drugs but believed "he did not have any choice but to continue to reply to the officers' questions, and that he was not free to leave."  The officers asked André to hand over his boarding pass and ID, and André complied, believing "he could [not] say no." The officers recorded André's information and continued to ask André questions about his travel plans.  One officer told André that they were conducting "random" stops and that their questions were "protocol."  "After approximately five minutes of standing in the narrow jet bridge and being questioned, Mr. André was told by the officers that he was free to leave and board the plane."[4]

Plaintiffs alleged that their experiences "were not isolated incidents," but "part of a longstanding, formal CCPD program" that CCPD operates "out of the Atlanta Airport."  As part of the program, CCPD officers and CCDAO investigators "wait in the jet bridge of departing domestic flights and conduct what they claim are 'random,' 'consensual' encounters with passengers attempting to board their flights."  These stops generally resemble the

---

[3] Plaintiffs alleged that these officers were individual defendants Aimee Branham and Michael Hooks.

[4] Plaintiffs also allege similar experiences by non-parties to this case, Jean Elie in 2019 and Preston Lewis in 2017.

experiences of English and André.  But according to plaintiffs, "these encounters are neither random nor consensual."  Moreover, plaintiffs alleged that individual defendant Sergeant Smith had "supervisory responsibilities" over the drug interdiction program and knew about the allegedly unlawful nature of the stops carried out by his subordinates but failed to intervene.

In support of their contention that the drug interdiction program is not consensual, plaintiffs pointed to the coerciveness of modern airport security.  Specifically, plaintiffs described the heightened post-9/11, TSA-run airport security and noted that passengers "are bound to follow" law enforcement's orders when going through airport security.  Plaintiffs alleged that defendants are "[a]ware of the already profoundly coercive nature of law enforcement encounters in the airport generally," and they "choose a uniquely coercive moment, manner, and location to stop passengers" by "accost[ing] passengers in narrow, highly-restricted jet bridges, . . . catching [passengers] off guard and blocking their paths," then "hold[ing] the passengers' identifications and tickets while bombarding them with questions."  "By design, all of these factors exert tremendous coercive pressure on an individual passenger in the jet bridge to acquiesce to the officers' wishes."  Plaintiffs alleged that "[r]easonable individuals interdicted by CCPD officers in jet bridges would not and do not believe they are free to decline the officers' requests, or to ignore and navigate around the officers absent affirmative permission."

Plaintiffs also alleged that Clayton County's drug interdiction program impermissibly targets passengers based on race.  Specifically, plaintiffs alleged that the drug interdiction program "purposefully discriminates against Black passengers, and against passengers of color more generally."  In support, plaintiffs alleged that for 378 of the 402 documented stops during the relevant period,[5] CCPD recorded the race of the passenger, and 56% of the passengers were black.  Yet "only 8% of American air travelers are Black" and "[t]he Atlanta Airport's domestic airline population reflects the general population of American air travelers."  They maintained that this disparity is statistically significant.

Out of these facts, plaintiffs asserted claims for (1) unlawful seizures in violation of the Fourth and Fourteenth Amendments, (2) an unlawful search in violation of the Fourth and Fourteenth Amendments, (3) violations of the Equal Protection Clause of the Fourteenth Amendment, and (4) violations of 42 U.S.C. § 1981. Plaintiffs brought their claims under 42 U.S.C. § 1983.  Defendants moved to dismiss plaintiffs' amended complaint.  The district court granted defendants' motion.

The district court held that: (1) plaintiffs failed to state a claim for unlawful seizure because their interactions with defendants were voluntary; (2) English failed to state a claim for unlawful search because the search of his bag was voluntary;

---

[5] Plaintiffs define the relevant time period as "September 2020 through April 2021."

(3) plaintiffs failed to state an equal-protection claim because they failed to allege a similarly situated comparator, a discriminatory effect, and a discriminatory intent; (4) plaintiffs' claims against individual officers in their official capacities were due to be dismissed because they were duplicative of plaintiffs' claims against Clayton County, which is a named defendant;[6] (5) the individual officers were entitled to qualified immunity on plaintiffs' claims against them in their individual capacities; (6) plaintiffs' claims under 42 U.S.C. § 1981 failed because plaintiffs failed to plausibly allege underlying constitutional violations or Clayton County's liability; and (7) plaintiffs' claims against Sergeant Smith based on supervisory liability failed because plaintiffs did not plausibly allege underlying constitutional violations.  Plaintiffs timely appealed.

## II.  Standard of Review

"We review *de novo* a district court's ruling on a motion to dismiss, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff."  *Moore v. Cecil*, 109 F.4th 1352, 1365 (11th Cir. 2024) (quotation omitted).  "To prevent dismissal under Rule 12(b)(6), the plaintiff must allege sufficient facts to state a claim for relief that is 'plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[6] These dismissals included the district court's dismissal of plaintiffs' claims against the Chief of CCPD in his official capacity.  On appeal, plaintiffs do not challenge this part of the district court's order.  Accordingly, we summarily affirm these dismissals.  *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1309 (11th Cir. 2009) ("A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual.").

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Additionally, "[w]e review *de novo* determinations that officers are entitled to qualified immunity." *Ingram v. Kubik*, 30 F.4th 1241, 1249 (11th Cir. 2022).  When a defendant moves to dismiss a complaint on qualified-immunity grounds, "the district court must dismiss any claims that fail to allege a violation of clearly established law." *Id.* at 1250.

### III.    Discussion

Before we consider plaintiffs' claims, we describe some background principles that apply to the rest of our discussion.  All of plaintiffs' claims arise under 42 U.S.C. § 1983.  Under that statute, a plaintiff may sue any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected" the plaintiff "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  To state a claim under this statute, "a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law and (2) such deprivation occurred under color of state law." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010).

Not all deprivations of a right, however, are redressable.  As we will discuss in more detail below, the doctrine of "qualified immunity offers complete protection for government officials sued

in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010) (alteration adopted) (quotation omitted). Municipal entities, on the other hand, "are not protected from compensatory damages by the doctrine of qualified immunity" like individual officials are. *Moore v. Morgan*, 922 F.2d 1553, 1556 (11th Cir. 1991). Instead, suits against municipal entities encounter a different hurdle: a municipal entity may be liable for monetary damages under 42 U.S.C. § 1983 only if the entity's policy or custom caused a deprivation of the plaintiff's federal rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

In this case, plaintiffs argue that (1) they plausibly alleged the individual defendants, acting under color of state law, deprived them of their Fourth Amendment and equal-protection rights, (2) the individual defendants are not entitled to qualified immunity on any of plaintiffs' claims, and (3) they plausibly alleged their claims against Clayton County under *Monell*. For their part, defendants do not contest that they acted under color of state law at all relevant times. Thus, our review turns on (1) whether plaintiffs plausibly alleged that they were deprived of federal rights, and (2) which, if any, defendants may be liable for those deprivations. We take each of plaintiffs' claims in turn, addressing qualified immunity and *Monell* liability for each claim as we go.

### A.    Plaintiffs plausibly alleged unreasonable seizures

Plaintiffs argue that their "complaint plausibly allege[d] that CCPD officers . . . unlawfully restrained Mr. André's and Mr. English's freedom of movement when the officers stopped them on the jet bridge." Plaintiffs also argue that these encounters were not consensual. Defendants respond that plaintiffs' encounters with CCPD officers did not rise to the level of "unlawful seizure" because they "were brief, voluntary, and non-coercive." We agree with plaintiffs.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)). In other words, a person's "freedom of movement" must be restrained "by means of physical force or a show of authority." *Mendenhall*, 446 U.S. at 553 (opinion of Stewart, J.). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari*, 499 U.S. at 628; *see also Michigan v. Chesternut*, 486 U.S. 567, 573–74 (1988) (observing that the Supreme Court has embraced the

objective test laid out in Justice Stewart's opinion in *Mendenhall*). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554 (opinion of Stewart, J.).

In our seminal case on airport stops, we have enumerated further factors to determine whether a seizure occurred in an airport by "looking to the totality of circumstances of an airport stop." *United States v. Berry*, 670 F.2d 583, 597 (5th Cir. Unit B 1982) (*en banc*).[7] That totality-of-the-circumstances inquiry requires us to "closely scrutinize whether those circumstances [surrounding the stop] reveal the presence of any coercion." *Id.* The relevant factors include: "blocking an individual's path or otherwise intercepting him to prevent his progress"; "retaining an individual's ticket for more than a minimal amount of time or by taking a ticket over to a ticket counter"; "statements by officers that individuals are suspected of smuggling drugs"; "[s]tatements which intimate that an investigation has focused on a specific individual"; and "informing an individual that an innocent person would cooperate with police." *Id.* We have also emphasized that "blocking an

---

[7] "We adopted as binding precedent all Fifth Circuit . . . Unit B decisions from any date." *United States v. Schultz*, 565 F.3d 1353, 1360 n.4 (11th Cir. 2009) (*per curiam*).

individual's path" is "a consideration of great, and probably decisive, significance." *Id.*

Several of our cases about airport stops apply *Berry* and provide guidance on whether plaintiffs plausibly alleged unlawful seizures in this case. On the lawful side of the ledger, in *United States v. Jensen*, two Drug Enforcement Agency ("DEA") agents approached the defendant at his gate, sat down next him, identified themselves as DEA agents, and asked the defendant if they could talk with him. 689 F.2d 1361, 1362 (11th Cir. 1982). The defendant agreed. *Id.* When the agents requested the defendant's ticket and ID, the defendant complied. *Id.* Shortly thereafter, the agents returned the ticket and ID and told the defendant, "[W]e're looking for drugs and narcotics at the airport. Are you carrying any drugs or narcotics either on your person or in your luggage?" *Id.* The defendant said no, and then consented to a search of his luggage. *Id.* We disagreed with the defendant's argument "that, after being asked for documents and identification, being told that the person questioning him was a narcotics agent, being asked whether he was carrying drugs, and being asked to consent to a search, no person would have felt free to leave." *Id.* at 1363. Specifically, we said that the lead agent's "request for identification, identification of himself, and question concerning whether [the defendant] was carrying drugs indicated no more than an interrogation as part of a more general inquiry into drug smuggling." *Id.* The agent "never accused [the defendant] of carrying drugs and never even stated that he suspected Jensen of carrying drugs." *Id.* We concluded that "[n]o seizure occurred on the facts at issue." *Id.* at 1364.

In *United States v. Armstrong*, we similarly found the airport stop was lawful.  In that case, an officer approached the defendant "in the public concourse" of the airport.  722 F.2d 681, 684 (11th Cir. 1984).  There, "the only display of authority occurred when the detective approached [the defendant] and identified himself as a deputy sheriff."  *Id.*  The officer "requested, but did not demand to see, the appellant's identification and ticket.  He notified appellant that he was free to leave and that he did not have to consent to the search."  *Id.*  Accordingly, we "conclude[d] that the detective's initial approach involved no restraint of appellant's liberty, but rather that it fell into the first *Berry* category of a non-coercive police-citizen encounter" in an airport which "is outside the realm of [F]ourth [A]mendment protection."  *Id.*  We emphasized that the defendant did "not assert[] any facts to show that [the officer] kept both pieces of identification while continuing to interrogate him."  *Id.* at 685.  Instead, the officer "stressed to both men that they were free to leave."  *Id.*

Finally, in *United States v. Puglisi*, we again held the airport stop did not violate the Fourth Amendment.  The officer approached the defendant in the airport terminal "from the side and spoke always in [a] normal conversational tone."  723 F.2d 779, 784 (11th Cir. 1984).  The officer "asked permission" to speak with the defendant; "he did not simply walk up to [the defendant] and begin asking questions."  *Id.*  The officer "never held [the defendant's] ticket or identification longer than 20–30 seconds," instead "returning [the documents] promptly each time" the officer asked for them.  *Id.*  The officer also did not tell the defendant that

16                    Opinion of the Court                    23-13253

he was a suspected drug courier, did not request that the defendant accompany him to a DEA office, and informed the defendant that he could refuse to be searched. *Id.* On these facts, we held that this encounter "clearly did not constitute a seizure." *Id.*

On the other hand, in *United States v. Elsoffer*, we concluded that a "seizure" triggering the Fourth Amendment's protections had occurred. In that case, we observed that the officer conducting the airport stop in the airport terminal "retained [the defendant's] ticket while asking for his driver's license, then retained both documents while interrogating him." 671 F.2d 1294, 1297 (11th Cir. 1982). We stated that, "[g]iven the circumstances surrounding an airport stop, [the defendant] hardly could have felt free to leave while [the officer] retained the ticket—especially since [the defendant] needed the ticket in order to continue his flight to New York." *Id.* Accordingly, we "h[e]ld that a seizure occurred when [the officer] retained the [defendant's] ticket while asking for further identification."[8] *Id.*

Assessing the totality of the circumstances in this case using the *Berry* factors and *Berry*'s progeny, plaintiffs plausibly alleged they were "seized" within the meaning of the Fourth Amendment.

We begin with English's allegations. The first *Berry* factor, whether officers blocked the passenger's path or intercepted the

---

[8] The seizure, however, did not violate the defendant's Fourth Amendment rights because the officers had reasonable suspicion to seize him. *See Elsoffer*, 671 F.2d at 1297.

passenger to prevent his progress, is present here: English plausibly alleged that defendants intercepted him and blocked his path to his plane on the narrow jet bridge. We accord "great, and probably decisive, significance" to this factor. *Berry*, 670 F.2d at 597.

The second *Berry* factor, whether officers retained an individual's ticket for more than a minimal amount of time, is also present as to English: the officers in this case held onto English's ID and boarding pass for the duration of the encounter, while "continu[ing] to ask Mr. English if he was carrying illegal drugs" and "ask[ing] questions about his profession" and his travel. *See id.* We have emphasized the fact that officers retained a passenger's ticket or identification while questioning the passenger in several cases finding a seizure.[9] *See Elsoffer*, 671 F.2d at 1297; *see also United States v. Thompson*, 712 F.2d 1356, 1360–61 (11th Cir. 1983); *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984); *cf. Jensen*, 689 F.2d at 1362 (noting that the officer promptly returned the

_____

[9] At oral argument, defendants insisted that because both plaintiffs had already shown their boarding passes and IDs to the airlines to board their flights, nothing stopped them from continuing to board their flights even while officers retained those documents. Defendants argued that plaintiffs would merely be inconvenienced by having to reclaim their IDs later or get new IDs after their travels. Evidently, defendants theorize that a reasonable person would willingly abandon his physical government ID and boarding pass (which might also be on his cell phone) to law enforcement as he boarded a departing plane. Common sense and the Supreme Court both refute this theory. *See Florida v. Bostick*, 501 U.S. 429, 435–36 (1991) (stating that a person would not "feel free to leave" a soon-to-depart bus in part because the person would risk "losing whatever baggage he had locked away in the luggage compartment" of the bus).

passenger's ticket and ID before questioning the passenger); *Armstrong*, 722 F.2d at 685 (same); *Puglisi*, 723 F.2d at 784 (same).

Moreover, in our cases applying *Berry*, we have enumerated an additional factor concerning whether officers "simply walk[ed] up to [the passenger] and beg[a]n asking questions" or whether the officers asked to speak with the passenger first to alert the passenger of the voluntary nature of the stop. *Puglisi*, 723 F.2d at 784; *see Armstrong*, 722 F.2d at 684. In this case, English plausibly alleged that the officers stopped him and began asking questions without telling him he could leave until after they finished questioning him.

Proceeding through the rest of English's allegations, the remaining *Berry* factors ask whether the officers made any specific accusations or intimations that the passenger was carrying contraband. *See Berry*, 670 F.2d at 597; *Jensen*, 689 F.2d at 1363. Although these factors were not present in English's allegations, the absence of these factors do not overcome the coercive nature of the individual defendants' actions that we have already discussed.

To sum up our discussion of English's allegations, in *Berry* and its progeny, we have emphasized that the presence of the first two *Berry* factors favors finding that a seizure occurred. *See Berry*, 670 F.2d at 597; *Elsoffer*, 671 F.2d at 1297; *Thompson*, 712 F.2d at 1360–61; *Chemaly*, 741 F.2d at 1352; *Jensen*, 689 F.2d at 1362; *Armstrong*, 722 F.2d at 685; *Puglisi*, 723 F.2d at 784. The presence of these two factors plus the fact that officers simply walked up to

English and began asking questions weighs in favor of finding that English plausibly alleged a seizure. *See Puglisi*, 723 F.2d at 784; *Armstrong*, 722 F.2d at 684. Looking to the totality of the circumstances, English plausibly alleged he was "seized" within the meaning of the Fourth Amendment.[10]

We reach the same conclusion with respect to André. Like English, André plausibly alleged the presence of the first two *Berry* factors. He alleged that individual defendants intercepted him on the jet bridge, blocking his path to continue onto his plane. Then, individual defendants "continued to ask Mr. André questions . . . about his travel plans and his reason for flying" while they held onto "his ticket and government ID." As discussed, we have emphasized that the presence of the first two *Berry* factors are important in finding that a seizure occurred. *See Berry*, 670 F.2d at 597; *Elsoffer*, 671 F.2d at 1297; *Thompson*, 712 F.2d at 1360–61; *Chemaly*, 741 F.2d at 1352; *Jensen*, 689 F.2d at 1362; *Armstrong*, 722 F.2d at 685; *Puglisi*, 723 F.2d at 784. And as with English, the officers simply walked up to André and "began challenging him with a series of questions," and they did not inform André he was free to leave until after they

_____

[10] Plaintiffs also stress that their encounters occurred post-9/11, which changed how a "reasonable person" might view encounters with law enforcement at an airport, *i.e.*, a reasonable person is more likely to feel coerced into compliance. We have never specifically addressed whether post-9/11 airport stops should be treated differently than pre-9/11 airport stops. But we leave that question for another day because, as discussed, plaintiffs plausibly alleged that their encounters in this case were Fourth Amendment seizures even under our pre-9/11 caselaw.

finished questioning him.  The presence of this factor also weighs in favor of finding that André plausibly alleged he was "seized" within the meaning of the Fourth Amendment.  *See Puglisi*, 723 F.2d at 784; *Armstrong*, 722 F.2d at 684.[11]

Faced with our on-point precedent showing that both plaintiffs were seized under the Fourth Amendment, defendants rely on inapposite cases to argue no seizure occurred.  In particular, defendants cite *United States v. Drayton*, 536 U.S. 194 (2002), *INS v. Delgado*, 466 U.S. 210 (1984), and *Bostick* to argue that "an officer's positioning between a passenger and an exit, as well as the fact that questioning occurred in a narrow space, does not lead to the conclusion that" a seizure occurred.  None of these cases helps defendants.

In *Drayton*, the Supreme Court determined that officers did not violate the Fourth Amendment when questioning passengers on a bus.  536 U.S. at 197.  The Supreme Court noted that when the officers boarded the bus, the lead officer "left the aisle free so that respondents could exit."  *Id.* at 204.  The record reflected "no blocking of exits."  *Id.*  Although another officer was "position[ed] at the front of the bus," that officer also "left the aisle clear."  *Id.* at 205.  *Drayton* is distinguishable because the officers did not block the paths of the bus passengers to leave the bus, *see id.* at 203–05,

---

[11] As with English, André also did not allege the presence of the *Berry* factors that ask whether the officers made any specific accusations or intimations that he was carrying contraband.  *See Berry*, 670 F.2d at 597; *Jensen*, 689 F.2d at 1363.

but the individual defendants here blocked plaintiffs' paths to board the plane, *see Berry*, 670 F.2d at 597.

In *Delgado*, the Supreme Court considered the former Immigration and Naturalization Service's ("INS") practice of sending agents into worksites to determine if any illegal aliens were present.   466 U.S. at 211–12.   The Court observed that when undertaking this practice, the INS "placed agents near the exits of the factory sites." *Id.* at 218.   The Court noted, however, that the workers remained free to move about the factories to do their jobs and faced only "the mere possibility" of being questioned if they tried to leave the factories. *Id.* at 218–19.   Indeed, two respondents in the case left their buildings and were not questioned or detained at all. *Id.* at 219 n.7.   Accordingly, the Court "reject[ed] the claim" that the placement of the agents near factory exits constituted a seizure of the workers at the factories. *Id.* at 218.   Again, these facts are distinguishable from this case because the individual defendants here *did* block plaintiffs' movement to question them.

And in *Bostick*, the Supreme Court again considered a drug interdiction program that required officers to "board buses at scheduled stops and ask passengers for permission to search their luggage."   501 U.S. at 431.   Bostick, the respondent, argued that officers "seized" him under the Fourth Amendment when they questioned him on a bus "because there is nowhere to go on a bus." *Id.* at 435.   He argued "there [was] little room to move around" while officers questioned him "in the cramped confines of a bus." *Id.*   The Court observed, however, that "Bostick's freedom of

movement was restricted by a factor independent of police conduct—*i.e.*, by his being a passenger on a bus."[12]  *Id.* at 436. Bostick's "bus was about to depart," so if he "disembarked, he would have risked being stranded and losing whatever baggage he had locked away in the luggage compartment." *Id.* at 435.  In other words, Bostick "would not have felt free to leave the bus even if the police had not been present." *Id.* at 436.  Accordingly, the Court held that "the 'free to leave' analysis . . . [was] inapplicable."[13]  *Id.* Here, however, the individual defendants blocked plaintiffs' paths and questioned them as they tried to walk onto their flights.

Both plaintiffs plausibly alleged the presence of several *Berry* factors and other factors we have emphasized: plaintiffs' paths were blocked by officers, the officers held onto plaintiffs' IDs and boarding passes during questioning, and the officers did not inform plaintiffs of the voluntary nature of the questioning or that plaintiffs were free to leave until after officers finished their questioning.  *See Berry*, 670 F.2d at 597; *Elsoffer*, 671 F.2d at 1297; *Thompson*, 712 F.2d at 1360–61; *Puglisi*, 723 F.2d at 784.

---

[12] The Court explicitly "refrain[ed] from deciding whether or not a seizure occurred" in *Bostick*.  501 U.S. at 437.  Instead, the Court rejected the Florida Supreme Court's use of a *per se* test to determine if a seizure occurred, emphasizing that lower courts should consider "the totality of the circumstances." *Id.*

[13] By contrast, the Court distinguished police encounters within airports, the exact situation we face in this appeal: "[w]hen police attempt to question a person who is walking . . . through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking." *Id.* at 435.

Accordingly, we conclude that plaintiffs plausibly alleged they were "seized" under the Fourth Amendment.

But a seizure alone is not a violation of the Fourth Amendment, as a brief seizure is still "reasonable" if the officers had a reasonable suspicion of wrongdoing. *See Thompson*, 712 F.2d at 1359. Accordingly, we must determine whether the alleged seizures were nonetheless reasonable under the Fourth Amendment because they were supported by at least a reasonable suspicion of wrongdoing. *See id.* Here, plaintiffs alleged and defendants do not dispute there was no basis for reasonable suspicion at all. According to plaintiffs, the encounters in this case were based on race.[14] Accordingly, plaintiffs have plausibly alleged that they suffered unreasonable seizures which violate the Fourth Amendment. *Cf. Elsoffer*, 671 F.2d at 1297 (finding that a passenger was "seized" under similar circumstances but declining to find a violation of the passenger's Fourth Amendment rights because the officers had reasonable suspicion to stop the passenger). Having concluded that plaintiffs plausibly alleged that their Fourth Amendment rights were violated, we next determine which defendants, if any, may be liable for those violations.

---

[14] As we will explain, however, although plaintiffs allege that the encounters in this case were race-based, they fail to plausibly allege that the defendants in this case acted with a discriminatory purpose.

24                    Opinion of the Court                 23-13253

> 1.    The individual defendants are entitled to qualified immunity for the unreasonable seizures

The district court held that, even if plaintiffs plausibly alleged a Fourth Amendment violation, the individual defendants were entitled to qualified immunity because, in relevant part, the law was not clearly established. On appeal, plaintiffs argue that defendants violated clearly established law that *Berry* settled decades ago. Defendants respond that *Berry* only established how fact-intensive the relevant inquiry is, and defendants highlight *Armstrong*, *Puglisi*, and *Jensen*—which we have already discussed in depth—as similar cases in which we found no constitutional violations. We agree with defendants.

"In general, when government officials are performing discretionary duties, . . . they are entitled to qualified immunity."[15] *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023). "A plaintiff may rebut this entitlement by showing that the government officials (1) committed a constitutional violation; and (2) that this violation was clearly established in law at the time of the alleged misconduct." *Id.* (quotation omitted). "The test is conjunctive, and if a plaintiff fails either prong of the qualified immunity analysis, his claim is barred." *Id.* A plaintiff may show that the law is clearly established through one of three ways: (1) "show[ing] that a materially similar case has already been decided, whose facts are

---

[15] Plaintiffs do not dispute that the individual defendants in this case were performing discretionary duties at all relevant times.

similar enough to give the police notice"; (2) "show[ing] that a broader, clearly established principle" derived from "general statements of the law contained within the Constitution, statute, or caselaw" should "control the novel facts of his case"; or (3) "show[ing] that the officer's conduct so obviously violates the [C]onstitution that prior case law is unnecessary." *Id.* (alteration adopted) (emphasis and quotations omitted); *see also Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. July 11, 2025) (*en banc*).

When determining whether a rule is "clearly established," we must keep in mind that "[t]he rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotation omitted). "This requires a high degree of specificity." *Id.* (quotation omitted). "A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established." *Id.* at 64 (alteration adopted) (quotation omitted).

Plaintiffs proceed using the second method for showing that the law is clearly established by contending that *Berry* clearly established when an officer "seizes" a passenger within the meaning of the Fourth Amendment.[16]

---

[16] By relying on *Berry*, plaintiffs do not argue that a materially similar case has been decided which gives the individual defendants notice of the unlawfulness of their conduct (after all, we concluded in *Berry* that no unreasonable seizure occurred). Nor do plaintiffs suggest that the individual defendants' "conduct so obviously violate[d] the [C]onstitution that prior case law is unnecessary."

We disagree for three reasons.  First, *Berry* did not announce "general statements of the law" that "clearly established" when a Fourth Amendment seizure occurs.  *Edger*, 84 F.4th at 1235 (quotation omitted).  Instead, *Berry* concluded only that "in looking to the totality of circumstances of an airport stop, a court should closely scrutinize whether those circumstances reveal the presence of any coercion." 670 F.2d at 597.  In so doing, *Berry* did not purport to "provide a catalog of all factors that might be relevant to a court's inquiry." *Id.*  Instead, we noted "some specific factors . . . on which a court should place great weight." *Id.*[17]  Second, our cases applying *Berry* do not demonstrate a clearly established rule, either.  We have come to varying conclusions when applying the *Berry* factors to fact patterns that resemble plaintiffs' allegations in this case.  *Compare, e.g.*, *Jensen*, 689 F.2d at 1363 (finding no seizure), with *Elsoffer*, 671 F.2d at 1297 (finding a seizure).  Third, as discussed, *Berry* mentioned several other factors that plaintiffs did

---

*Edger*, 84 F.4th at 1235 (alteration adopted) (quotation omitted).  Thus, we do not address those grounds for finding clearly established law.

[17] Even concerning factors that carry "great weight," *Berry* was not as categorical as our language suggested.  In *Berry*, we stated that "blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance." 670 F.2d at 597.  But when we considered the facts at hand, we declined to find that the agents' initial stop of the defendant was a "seizure" even though "the agents stopped Berry's progress toward a taxi stand," because there was "no evidence of coercion on the record." *Id.* at 603.  Thus, even this *Berry* factor—blocking an individual's path—cannot decisively tip the scales such that impeding a passenger's progress "clearly" is a seizure.

not allege were present in this case. *See Berry*, 670 F.2d at 597 (listing "statements by officers that individuals are suspected of smuggling drugs"; "[s]tatements which intimate that an investigation has focused on a specific individual"; and "informing an individual that an innocent person would cooperate with police" as relevant factors). Absent those factors, the individual defendants' alleged conduct did not clearly violate *Berry*, either.

Accordingly, by pointing only to *Berry*, plaintiffs fail to show that the law was clearly established: the unlawfulness of the individual defendants' "conduct does not follow immediately from the conclusion that the [*Berry*] rule was firmly established." *Wesby*, 583 U.S. at 64 (quotation omitted). Thus, the individual defendants are entitled to qualified immunity.[18] We affirm the district court's dismissal of plaintiffs' unreasonable-seizure claims against the individual defendants. *See Ingram*, 30 F.4th at 1250.

---

[18] Sergeant Smith is entitled to qualified immunity for slightly different reasons. Plaintiffs alleged their Fourth Amendment claims against Smith via supervisory liability. Smith did not personally participate in the alleged stops. A supervisor is entitled to qualified immunity if his alleged supervisory conduct did not violate clearly established law. *See Ingram*, 30 F.4th at 1256; *see also Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) ("[E]ach defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions."). Plaintiffs do not point us to any clearly established law that Smith allegedly violated by supervising the stops.

2.    Plaintiffs plausibly alleged Clayton County's liability under *Monell* for the unreasonable seizures

We reach a different result, however, concerning Clayton County's liability for the seizures.  The district court held that "[e]ven if the Amended Complaint successfully alleged an underlying constitutional violation, it fails to allege a custom or policy supporting *Monell* liability" to hold Clayton County liable. On appeal, plaintiffs argue that they plausibly alleged that the drug interdiction program was "a policy, . . . or a widespread practice that constitutes a custom" of Clayton County.  Defendants reiterate that no constitutional violations occurred, but even if violations did occur, plaintiffs failed to plausibly allege an official policy or custom by Clayton County.  Plaintiffs respond that defendants are "patently incorrect in light of the complaint's detailed allegations."  We agree with plaintiffs.

In *Monell*, the Supreme Court held that a plaintiff can sue a municipal entity for damages under 42 U.S.C. § 1983 if the plaintiff alleges that he suffered a constitutional violation stemming from the entity's official policy or custom.  *See* 436 U.S. at 690–91.  "To prove a *Monell* claim, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  *Teel v. Lozada*, 99 F.4th 1273, 1279 (11th Cir. 2024) (quotation omitted).

The exoneration of an individual defendant does not, by itself, exonerate the municipal entity under section 1983. *See Barnett v. MacArthur*, 956 F.3d 1291, 1301 (11th Cir. 2020). We must ask whether a judgment in favor of individual officers "can be harmonized with a concomitant . . . decision imposing liability on the municipal entity." *Id.* at 1302 (quotation omitted). An individual defendant's successful qualified-immunity defense can be harmonized with a municipal entity's liability. *Id.* at 1302 n.8.

Here, because we have already found that plaintiffs plausibly alleged that their Fourth Amendment rights were violated (the first *Monell* element), we next consider whether plaintiffs plausibly alleged the second and third elements of a *Monell* claim. *See Teel*, 99 F.4th at 1279. Beginning with the second *Monell* element, the existence of a policy or custom, plaintiffs plausibly alleged that the violations of their Fourth Amendment rights occurred while defendants were executing Clayton County's drug interdiction program. Indeed, one defendant explicitly referred to his questioning of André as "protocol." And plaintiffs plausibly alleged that defendants had executed hundreds of stops in the jet bridge pursuant to the drug interdiction program. As for the third element, whether the policy or custom caused the constitutional violations, plaintiffs' own alleged experiences, plus the alleged experiences of other passengers who are not parties to this case, plausibly demonstrate that these stops violate passengers' Fourth Amendment rights. In other words, plaintiffs have plausibly alleged that the drug interdiction program itself calls for repeated violations of the Fourth Amendment. Accordingly, plaintiffs have

plausibly alleged a *Monell* claim for Fourth Amendment violations against Clayton County.  *See Hoefling v. City of Miami*, 811 F.3d 1271, 1280–81 (11th Cir. 2016) (concluding that the plaintiff plausibly alleged a *Monell* claim where the plaintiff alleged (1) a violation of his own constitutional rights, (2) that others had suffered the same or similar constitutional violations, and (3) that the municipality itself referred to these constitutional violations as part of a "program"); *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404–05 (1997) ("Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.").  Because the district court concluded otherwise, we reverse on this issue.

In opposition to this conclusion, defendants argue that plaintiffs' *Monell* claim fails because (1) plaintiffs failed to plausibly allege any underlying Fourth Amendment violations and (2) the drug interdiction program was not "adhered to with deliberate indifference."  We reject defendants' first argument because, as discussed, we conclude that plaintiffs plausibly alleged unreasonable seizures in violation of the Fourth Amendment.  As for defendants' second argument, the deliberate-indifference standard only applies "where the plaintiff claims that a municipality's facially valid actions violated his constitutional rights."  *McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004).  In that case, "a plaintiff must demonstrate that the lawful action was taken with deliberate indifference as to its known or obvious consequences."  *Id.* (quotation omitted).  We do not consider

deliberate indifference, however, where the plaintiff claims that the municipality "directs an employee" to "violate[] federal law." *Id.* (quoting *Brown*, 520 U.S. at 404–05). And as discussed, plaintiffs plausibly alleged that Clayton County's drug interdiction program directs the county's officers to violate passengers' Fourth Amendment rights by conducting unreasonable seizures of the passengers.[19] Accordingly, defendants' argument about deliberate indifference is meritless. *See id.* Thus, plaintiffs' unreasonable-seizure claims may proceed against Clayton County.

### B.    *English plausibly alleged an unreasonable search*

On appeal, plaintiffs also contend that the search of English's luggage[20] was unlawful because he was seized unlawfully, and in any event, English did not consent to his luggage being searched by CCPD officers. Defendants respond that plaintiffs' allegations demonstrate that English consented to the search of his luggage. Plaintiffs reply that English's consent was coerced. We again agree with plaintiffs.

As discussed, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend.

---

[19] The record does not contain any written descriptions of or guidelines for the drug interdiction program such that we could determine that the program was facially valid. Accordingly, we accept as true plaintiffs' allegations in their amended complaint that the program "rel[ies] on coercion." *See Moore*, 109 F.4th at 1365.

[20] André did not allege an unlawful search claim.

IV.  Typically, warrantless searches are unreasonable under the Fourth Amendment. *Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021).  But as relevant to this case, "[i]t is well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.*  Not all consent, however, invokes this exception. The "consent must be the product of a free and voluntary choice." *Id.*  "Whether an individual's consent to a warrantless search was given voluntarily is a question of fact that must be decided in light of the totality of the circumstances." *Id.* (quotation omitted).[21]

Here, English alleged that during his unlawful seizure, he "acquiesced" to the search of his luggage.  Accordingly, we turn to whether English's consent to the search was voluntary. *Delancy*, 502 F.3d at 1308 (quotation omitted).

In considering English's allegations that his consent to search was coerced, we reach the same conclusion that we reached in *Chemaly* because the facts of that case are similar to plaintiffs' allegations.  In *Chemaly*, we considered whether a passenger

---

[21] Generally, if consent is given after an unlawful seizure, the government must show—in addition to the voluntariness of the consent—that the voluntary "consent was not a product of the illegal seizure." *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir. 2007) (quotation omitted); *see United States v. Santa*, 236 F.3d 662, 676 (11th Cir. 2000).  But the "voluntariness of consent is . . . a threshold requirement" to determining if that voluntary consent "remove[d] the taint of an illegal seizure." *Delancy*, 502 F.3d at 1308 (quotation omitted).  As we will explain, we conclude at that threshold that English's consent was involuntary.  Accordingly, we do not decide if his consent removed the taint of his unlawful seizure.

voluntarily consented to a search of his person and belongings while on a jet bridge boarding a plane. 741 F.2d at 1348–49. The passenger "was told to step aside so that the other passengers could continue to board the plane, and he was removed from the flow of traffic." *Id.* at 1349. The officer requested the passenger's ID and ticket, then he retained those documents while he questioned the passenger and asked to search the passenger's luggage. *Id.* The government argued that the passenger consented to this search. *Id.* at 1352. We disagreed and reversed the conviction: "[b]ecause the agent retained [the passenger's] ticket and passport, removed him from the other passengers for questioning, and did not inform him of his right to refuse consent," the passenger's consent to search was involuntary.[22] *Id.* at 1353; *see also United States v. Bacca-Beltran*, 741 F.2d 1361, 1362–63 (11th Cir. 1984) (applying *Chemaly* as a "companion case").

---

[22] We also listed several other "[r]elevant factors in determining voluntariness [of the consent to search], none of which is dispositive":

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

*Chemaly*, 741 F.2d at 1352 (quotation omitted). We also noted that the aforementioned *Berry* factors "are also relevant in determining the voluntariness of consent." *Id.*

English alleges a similar encounter, claiming that Campbell and Griffin retained his ticket and ID while they questioned him on the jet bridge. In so doing, the officers asked him to step out of the flow of boarding passengers. And according to his allegations, Campbell and Griffin did not inform him of his right to refuse consent to a search; indeed, only after searching his bag did they tell him that he was free to leave. Thus, English plausibly alleged that his "consent to search was not voluntary." *Chemaly*, 741 F.2d at 1353; *see also Bacca-Beltran*, 741 F.2d at 1362–63.[23] Accordingly, English plausibly alleged defendants' search of his luggage violated his Fourth Amendment rights. *See Fuqua*, 996 F.3d at 1151. As before, we next consider which defendants may be liable for that violation.

1.    The individual defendants are again entitled to qualified immunity for the unreasonable search

The district court determined that the individual defendants are entitled to qualified immunity on English's unreasonable-search claim. As we have explained, English can overcome

---

[23] Defendants try to distinguish *Chemaly* and *Bacca-Beltran* by highlighting other facts present in those cases but absent from English's allegations, such as comments from officers indicating the defendants in those cases had become targets of investigations. We agree that there are factual differences between English's case and those cases, but those factual differences do not render English's allegations of involuntary consent implausible, and plausibility is the relevant question at the motion to dismiss stage. *See Twombly*, 550 U.S. at 570.

qualified immunity if he can show that the individual defendants "(1) committed a constitutional violation; and (2) that this violation was clearly established in law at the time of the alleged misconduct." *Edger*, 84 F.4th at 1235 (quotation omitted). And a plaintiff may show that the law is clearly established through one of three ways: (1) "show[ing] that a materially similar case has already been decided, whose facts are similar enough to give the police notice"; (2) "show[ing] that a broader, clearly established principle" derived from "general statements of the law contained within the Constitution, statute, or caselaw" should "control the novel facts of his case"; or (3) "show[ing] that the officer's conduct so obviously violates the [C]onstitution that prior case law is unnecessary." *Id.* (alteration adopted) (emphasis and quotations omitted).

We have already concluded that English plausibly alleged that Campbell and Griffin violated the Fourth Amendment when they searched English's bag. As for the clearly-established prong, plaintiffs cursorily argue that "*Chemaly* and *Bacca-Beltran* clearly establish that Mr. English's consent [to search] was involuntary and that the search was therefore illegal." Because plaintiffs do not specify whether they are trying to show clearly established law through the first or second method for doing so,[24] we consider both

---

[24] By relying on *Chemaly* and *Bacca-Beltran*, plaintiffs do not argue that the individual defendants' "conduct so obviously violate[d] the [C]onstitution that prior case law is unnecessary." *Edger*, 84 F.4th at 1235 (alteration adopted) (quotation omitted). Thus, we do not address that ground for finding clearly established law.

methods. *See id.* Under either method, however, we are unpersuaded that the governing law was sufficiently clear to deny the individual defendants qualified immunity.

First, *Chemaly* and *Bacca-Beltran* are not "materially similar" enough to English's allegations to give Campbell and Griffin notice of the unlawfulness of the search. *Id.* (quotation omitted). In *Chemaly*, we emphasized that the officer—who had reason to believe the defendant was trying to transport contraband out of the country by plane—asked the defendant "specific and repetitive questions" about that contraband. *Chemaly*, 741 F.2d at 1353; *see id.* at 1348.[25] By asking such questions, the officer "intimate[d] that an investigation had focused on a specific individual," which "easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention." *Id.* at 1353 (alterations adopted) (quotation omitted). In other words, the officer "induce[d]" the defendant into consenting to a search in part by indicating through his questioning that he suspected the defendant of violating federal law and was about to arrest the defendant. *See id.* English did not allege a materially similar level of coercion-by-interrogation. English did not allege that Campbell and Griffin accused him of smuggling drugs or suggest he was

---

[25] When we decided *Chemaly*, federal law required anyone carrying more than $5,000 out of the country to report the currency to the federal government. *See Chemaly*, 741 F.2d at 1348; *see also* 31 U.S.C. § 5316 (the statute in its current form). Before officers searched the defendant, they had received a tip that he was about to carry $500,000 in unreported currency to another country. *See Chemaly*, 741 F.2d at 1348.

about to be arrested like the officers did in *Chemaly*; they merely asked English whether he had any drugs on him. Campbell and Griffin's questions "indicated no more than an interrogation as part of a more general inquiry into drug smuggling." *Jensen*, 689 F.2d at 1363.[26]

Second, *Chemaly* and *Bacca-Beltran* announce only case-specific holdings; neither announce any clear rules from which "the unlawfulness of the [individual defendants'] conduct . . . follow[s] immediately." *Wesby*, 583 U.S. at 64 (quotation omitted). After all, determining whether consent was voluntary is a fact-specific exercise. *See Fuqua*, 996 F.3d at 1151; *cf. Stanley v. City of Dalton*, 219 F.3d 1280, 1298 (11th Cir. 2000) (recognizing in the First Amendment context that when a governing rule requires "balancing" facts "on a case-by-case basis, our decisions tilt strongly in favor of [qualified] immunity by recognizing that only in the rarest of cases will reasonable government officials truly know" that their actions "violated clearly established federal rights" (quotation omitted)). And when conducting that exercise in *Chemaly*, we listed several "factor[s]" that led us to conclude that the defendant's consent was involuntary, including several (such as some of the *Berry* factors) that plaintiffs did not allege in this case. 741 F.2d at 1352–53; *see also Bacca-Beltran*, 741 F.2d at 1362 (noting

---

[26] Although *Jensen* concerned whether a seizure had occurred rather than the voluntariness of consent to a search, as discussed, *Chemaly* explained that "factors involved in a seizure question," such as the *Berry* factors, "are also relevant in determining the voluntariness of consent." *Chemaly*, 741 F.2d at 1352.

that *Chemaly* was a "companion case" that "controlled" our decision).  Thus, these cases did not clearly establish the law through "general statements of the law." *Edger*, 84 F.4th at 1235 (quotation omitted).

In sum, English failed to plausibly allege facts demonstrating that Campbell and Griffin should have been on notice that their actions in searching his bag violated the Fourth Amendment.[27]  *See Jensen*, 689 F.2d at 1363.  Thus, we affirm the dismissal of English's unreasonable-search claims against the individual defendants because the officers are entitled to qualified immunity.[28]  *See Ingram*, 30 F.4th at 1250.

> 2. English plausibly alleged Clayton County's liability under *Monell* for the unreasonable search

We next turn to English's unreasonable-search claim against Clayton County.  We have already concluded that English plausibly alleged that his Fourth Amendment right to be free from unreasonable searches was violated (the first *Monell* element).

---

[27] As discussed, we find enough similarities between *Chemaly*, *Bacca-Beltran*, and English's allegations in this case to conclude that English plausibly alleged a violation of his Fourth Amendment rights.  But *Chemaly* and *Bacca-Beltran* are not similar *enough* to English's allegations for him to overcome qualified immunity against the individual defendants in this case.  *See supra* note 23.

[28] Sergeant Smith is again entitled to qualified immunity for the reasons given *supra* note 18.

Thus, we consider whether plaintiffs plausibly alleged the second and third elements of a *Monell* claim. *See Teel*, 99 F.4th at 1279.

As before, English plausibly alleged the second *Monell* element, the existence of a policy or custom, by alleging that his unreasonable search occurred when defendants were executing Clayton County's drug interdiction program, which defendants had executed hundreds of times. And English plausibly alleged the third *Monell* element, which is causation: English's own alleged experience being searched (along with English's other alleged examples of these searches) plausibly demonstrates that searches conducted pursuant to the drug interdiction program violate passengers' Fourth Amendment rights. Accordingly, English has plausibly alleged a *Monell* claim for an unreasonable search against Clayton County. *See Hoefling*, 811 F.3d at 1280–81; *Brown*, 520 U.S. at 404–05. Thus, we reverse the district court's dismissal of this claim.

C.    *Plaintiffs did not plausibly allege an equal-protection violation*

The district court held that plaintiffs failed to plausibly allege that the drug interdiction program had a discriminatory effect or purpose such that it violated the Equal Protection Clause of the Fourteenth Amendment. On appeal, plaintiffs argue that they plausibly alleged both (1) a discriminatory effect through statistical disparities, and (2) that the drug interdiction program was motivated by a discriminatory purpose as demonstrated by the "stark" racial disparity which exists as to which passengers are

stopped, and supervisors knew of the program's racial disparities. Defendants respond that plaintiffs' statistics fail to show discriminatory effect or purpose, and plaintiffs' allegations about discriminatory purpose are conclusory. Plaintiffs argue, in essence, that the discriminatory effect of the program demonstrates discriminatory purpose. In so doing, plaintiffs have failed to plausibly allege that the defendants in this case acted with a discriminatory purpose.[29]

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. This clause "prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). To sustain a claim under the Equal Protection Clause, "[p]laintiffs must . . . show that the State's decision or act had a discriminatory purpose and effect."[30] *Greater*

---

[29] We recognize plaintiffs argue that Clayton County knew or should have known that its airport interdiction practice was racially discriminatory because, among other things, the County maintained logs that listed the name, flight information, race, gender, and date of birth of each stopped passenger, and non-party Jean Elie made a racial profiling complaint following his encounter. But plaintiffs do not allege that the individual defendants knew of any racially discriminatory complaint or saw the County's logs or that the County directed the individual defendants to single out black passengers for interdictions. Accordingly, we must look to plaintiffs' allegations about how officers execute the program to glean effect and purpose.

[30] If a plaintiff shows both a discriminatory purpose and effect, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this racial discrimination factor." *Greater Birmingham*

*Birmingham Ministries v. Sec'y of State for the State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (quotation omitted). "If plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail." *Id.*

We first consider whether plaintiffs plausibly alleged that defendants acted with a discriminatory purpose. We answer that question in the negative. Accordingly, we do not reach whether plaintiffs plausibly alleged discriminatory effect. *See id.*

The Supreme Court has explained that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977). "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Washington v. Davis*, 426 U.S. 229, 242 (1976). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265; *see also Iqbal*, 556 U.S. at 676 ("[T]he plaintiff must plead and prove that the defendant acted with discriminatory purpose.").

In support of their equal-protection claims, plaintiffs cite their allegations of racial disparities in the execution of the drug

---

*Ministries*, 992 F.3d at 1321 (alteration adopted) (quotation omitted). The district court did not reach this burden-shift, and the parties did not brief it on appeal. Because we conclude that plaintiffs failed to plausibly allege discriminatory purpose, we also do not reach the burden-shift. *See id.* at 1327–28.

interdiction program and that CCPD supervisors are aware of those disparities, but such allegations fail to state an equal-protection claim against the defendants in this case. Plaintiffs' amended complaint is devoid of any allegations that any individual defendant acted with a discriminatory purpose. Although plaintiffs alleged that André did not see any other black passengers in his boarding group when the individual defendants stopped him, plaintiffs do not plausibly allege that any of the officers who stopped English or André did so because English and André are black. *See Iqbal*, 556 U.S. at 676. Plaintiffs' allegations concerning the general operation of the drug interdiction program do not suffice: such allegations "shed[] no light on the intent of the particular agent[s] in this particular case." *Xi v. Haugen*, 68 F.4th 824, 840 (3d Cir. 2023). After all, the "sheer possibility" that each individual defendant acted with a discriminatory purpose (here, that they stopped plaintiffs because plaintiffs are black) based on allegations that are "merely consistent" with such a purpose (here, that plaintiffs were stopped and are black) does not suffice to state a claim against those defendants. *Iqbal*, 556 U.S. at 678 (quotation omitted). Accordingly, the district court properly dismissed plaintiffs' equal-protection claims against the individual defendants. *See id.*; *Greater Birmingham Ministries*, 992 F.3d at 1321 ("If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail.").

And without a constitutional violation by the individual defendants, Clayton County also is not liable. Unlike plaintiffs' Fourth Amendment claims, our judgment in favor of the individual

defendants on plaintiffs' equal-protection claims cannot be "harmonized" with a decision that plaintiffs plausibly alleged Clayton County violated the Equal Protection Clause. *Barnett*, 956 F.3d at 1302 (quotation omitted). *Monell* and its progeny do not "authorize[] the award of damages against a municipal [entity] based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm." *Teel*, 99 F.4th at 1288 (quotation omitted).

Here, plaintiffs' equal-protection claims against Clayton County arise out of plaintiffs' allegations that officers stopped them on the basis of their race because Clayton County had a policy directing the officers to do so. Logically, if the individual defendants did not stop plaintiffs because of their race, then plaintiffs were not subjected to a policy of stopping black passengers. Put another way, plaintiffs failed to plausibly allege the first element of a *Monell* claim: they suffered "no constitutional harm" for which Clayton County could be liable if officers did not stop them because of their race. *Id.* (quotation omitted). And because we have already concluded that plaintiffs have not plausibly alleged that the individual defendants stopped them because of their race,[31] we affirm dismissal of plaintiffs' equal-protection claims against Clayton County. *See Rooney v. Watson*,

---

[31] This conclusion dooms plaintiffs' claims under 42 U.S.C. § 1981, too: "§ 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982). Accordingly, we affirm the district court's dismissal of those claims.

101 F.3d 1378, 1381–82 (11th Cir. 1996) ("[O]ur finding that the [plaintiffs] did not suffer any constitutional deprivation makes it unnecessary to consider [the municipal entity's] policy or custom.").

## IV.    Conclusion

For the foregoing reasons, we conclude that plaintiffs plausibly alleged that defendants violated their Fourth Amendment rights to be free from unreasonable searches and seizures. The individual defendants are entitled to qualified immunity, but Clayton County is not. Accordingly, we reverse the dismissal of plaintiffs' Fourth Amendment claims against Clayton County. We affirm the dismissal of plaintiffs' remaining claims.

**AFFIRMED IN PART, REVERSED IN PART.**